### In re GRAMERCY TWINS ASSOCIATES, Debtor.

**Bankruptcy No. 92–B–44737(CB).**

United States Bankruptcy Court, S.D. New York.

Sept. 26, 1995.

---

1. This bankruptcy appeal having been disposed of, the Clerk is directed to close this case.

Tenzer Greenblatt Fallon & Kaplan by Andrew B. Eckstein, Harris N. Cogan, of counsel, New York City, for debtor.

Bachner Tally Polevoy & Misher by William J. Lowy, of counsel, New York City, and Andrew Williams, In–House Counsel—Mass Mutual, Springfield, MA, for Mass Mutual.

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

The matter before this Court is the confirmation of the Second Amended Plan of Reorganization filed by Gramercy Twins Associates, debtor and debtor in possession, (the "Debtor"), in its chapter 11 case. Massachusetts Mutual Life Insurance Company ("Mass Mutual"), the debtor's largest secured and unsecured creditor objects to the confirmation of the plan. For the reasons discussed below, this Court denies confirmation of the plan.

I. *BACKGROUND*

The Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on August 21, 1992. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, the Debtor has continued to operate its business. Its only asset consists of a 10–story commercial office building located at 35 East 21st Street in New York City (the "Property").

The Property is subject to two liens. The first lien is in favor of the City of New York (the "City") for unpaid pre-petition real-estate taxes as well as water and sewer charges in the amount of approximately $1 million at the time of confirmation (the "NYC Lien").[1] The second lien is in favor of Mass Mutual which secures the indebtedness of the Debtor to Mass Mutual, in the approximate amount of $17.9 million, consisting of principal interest, costs and fees, as evidenced by a Consolidation of Notes and an Assignment of Rents and Leases (the "As-

---

1. The Debtor projects the NYC Lien to be in excess of $1.0 million at the time of confirma-

signment of Rents").[2] The NYC Lien has priority over all other liens, including the mortgage lien of Mass Mutual created pursuant to a Consolidation and Modification agreement (the "Mortgage").

In September 1993, in response to the Debtor's chapter 11 filing, Mass Mutual moved, pursuant to §§ 362 and 363 of the Bankruptcy Code, to enjoin the Debtor from using the rents generated by the Property, to compel the rents to be turned over to Mass Mutual and to lift the automatic stay in order to allow Mass Mutual to proceed with the foreclosure action that was pending at the time of the Debtor's filing (hereinafter the "Lift Stay Motion"). Prior to this Court's adjudication of the Lift Stay Motion, the parties reached an agreement in October 1992, resolving their disputes. This agreement was reflected in an order of this Court dated March 17, 1993, (the "Cash Collateral Order") that called for the Debtor to: 1) apply rents according to an agreed upon budget; 2) turn over additional rents to Mass Mutual to protect its interest; and 3) submit its plan of reorganization and disclosure statement no later than February 16, 1993. The Cash Collateral Order also allowed Mass Mutual to proceed with its foreclosure proceeding to the point of judgment but not to execution. Since its approval, the Debtor has twice moved to have the Cash Collateral Order amended to increase the carve-out provisions for professional fees and/or strip the lien.[3]

On February 16, 1993, the Debtor filed its disclosure statement and plan of reorganization as required by the Cash Collateral Order. The Debtor has twice amended its disclosure statement and plan. By order dated May 26, 1993, the Debtor's Second Amended Disclosure Statement was approved, as modified therein.

The only remaining issue is the confirmation of the Debtor's Second Amended Plan of Reorganization (the "Plan"). Integral to this issue is the valuation of the Property. Pursuant to an agreement between the Debtor and Mass Mutual on March 26, 1993, the fair market value of the Property was established at $7,350,000. However, both parties agreed that this valuation would remain subject to reconsideration after ninety days. Thereafter, on September 2, 1993, Mass Mutual filed a motion for an order to alter the agreed upon valuation. Both parties then entered a second agreement fixing the value of the Property at $7,650,000 for the purposes of confirmation (the "Valuation").

### A. The Plan

The Plan separates claims into eight different classes. Of these eight classes, seven are impaired and, thus, entitled to a vote on the Plan.

*Class I* is comprised of the NYC Lien. This Class is impaired.[4] The Plan contemplates a distribution equal to 95% of the value of the NYC Lien claim on the effective date of the Plan.

*Class II* consists of Mass Mutual's first mortgage claim. Class II is impaired. The specific amount of Mass Mutual's secured claim will be determined by subtracting the amount of the NYC Lien (which will collect post-petition interest until the effective date of the Plan) from the value of the Property.

---

tion, with the 18% interest due and owing.

**2.** The Mortgage and the Assignment of Rents and Leases were dated April 19, 1990. Both agreements were recorded in the Office of the City Register, New York County on April 24, 1990; the former in Reel 1687, page 1403, and the latter in Reel 1687, page 1398.

**3.** By an order of this Court made in response to the first motion, the carve-out provisions were subsequently increased pending review at the final hearing. The Debtor's second motion was to increase the carve-out provisions to allow it to meet its professional expenses and to strip the lien in order to allow it to meet its administrative

expenses subject to a final determination by this Court. This motion was also granted.

On or about August 16, 1995, Mass Mutual moved to prohibit the Debtor's use of cash collateral, or alternatively moved for relief from the automatic stay or an appointment of a chapter 11 trustee. Its motion was prompted by the Debtor's failure to comply with several provisions of the Cash Collateral Order. At the hearing held before this Court on August 2, 1995, the Court denied Mass Mutual's motion but modified the Cash Collateral Order on the record.

**4.** Mass Mutual claims that the impairment is improper, an issue that will be addressed later.

The Plan contemplates that Mass Mutual be given a replacement five-year note in which Mass Mutual will be paid the full amount of its secured claim plus interest at 8% per annum over the earlier of a five year period or until such time the Property is sold. However, the decision to sell or refinance is solely at the discretion of the Debtor. If the Property is sold or refinanced, the Plan permits Mass Mutual to elect to receive either: (1) 50% of the net proceeds of the sale or refinancing of the Property after the payment of the requirements of the Plan; or (2) at least one 1% per annum on principal until the later date of the maturity of the replacement note (5 years) or the sale or refinancing of the Property. In effect, this provision allows Mass Mutual to opt for a 9% interest rate over five years (the so-called "9% Accrual Option") or to share in any potential upside if the Property is sold or refinanced, should one exist.

*Class III* consists of Mass Mutual's unsecured deficiency claim.[5] Class III is impaired. Under the Plan, Mass Mutual's deficiency claim will receive identical treatment as the other general unsecured claims in Class IV.

*Class IV* is impaired and consists of the general unsecured claims other than those in Class V and VI, totaling approximately $2,809,706.24. Pursuant to the Plan, unsecured claims in Classes III and IV will receive a distribution equal to approximately 2% of their claims, in four annual payments. Those unsecured creditors in classes III and IV with recourse against the former general partners of the Debtor may opt to receive an additional 97% of their claims in full satisfaction of their claim or retain any recourse they might have had.

*Class V* consists of a convenience class of seven unsecured claims each aggregating less than $1,000 (or voluntarily reduced to that level) and collectively totalling $7,482.86. Class V is impaired. Under the Plan, members of Class V will receive 50% of their

claim payable on the effective date of the Plan. Additionally, Class V creditors with recourse against the former general partners have the option of either: (1) retaining any and all rights against the former partners; or (2) receiving a payment from the former general partners in an amount equal to 49% of their claims up to a maximum of $2,000, in full release of such recourse against the former general partners.

*Class VI* is comprised of security deposit claims by the tenants of the Property totalling approximately $149,375.66. Class VI creditors are unimpaired. Pursuant to the Plan, members of this class will receive the full amount of their claims. As an unimpaired class, it was excluded from the vote on confirmation.

*Class VII* consists of two limited partners, Peter Catalano ("Catalano") and Michael Kornblum ("Kornblum"), and a former limited partner, Irwin Polivy ("Polivy"), (collectively, the "Class 'A' Limited Partners"). Catalano, Kornblum, Polivy and Atrium Management Corp. ("Atrium")—the general partner of the Debtor—(the "Participating Partners") collectively possess 100% of the existing equity in the Debtor. The Participating Partners are to contribute new capital (the "Capital Contribution") totaling $500,000, each paying the pro rata share in exchange for a subordinated claim of 8% per annum on the payment and equity in the reorganized Debtor. This Capital Contribution would be returned to each partner only after all of the Debtor's obligations under the Plan are fulfilled.

The Plan states that the Class 'A' Limited Partners in Class VII will transfer 30% of their equity in the reorganized Debtor to a certain Joseph Simone or his entity ("Simone")[6] in exchange for a contribution of approximately $950,000 to pay 95% of the NYC lien as contemplated by the Plan. In addition to the 30% of equity, Simone will also be entitled to a preferred return of 15%

---

5. Since Mass Mutual's claim against the Debtor is in the approximate amount of $17,937,734.80, and the valuation stipulated to by the two parties is significantly less than that, it is clear that Mass Mutual will have a large deficiency unsecured claim.

6. Simone is referred to as the Class B limited Partner.

per annum for five years on the amount of his new equity investment, and in the case of the sale or refinancing of the Property before five years, to the return of his investment, but only after Mass Mutual's secured claim has been paid. Simone will also be entitled to 50% of the sale/refinancing upside if one exists or he has the same 9% Accrual Option as Mass Mutual.

*Class VIII* is comprised of Atrium, a general partner, who controls a .5% interest in the Debtor. The Plan contemplates that Atrium will retain its equity interest in the Debtor and will be treated as a Participating Partner.

In connection with the Plan, all unsecured creditors were provided the opportunity to examine the individual financial statements of Catalano and Kornblum. Mass Mutual also had the opportunity to examine both limited partners.

## B. *The Vote*

Classes I, IV, VII and VIII unanimously voted to accept the Plan. Of these, only Classes I and IV were comprised of non-insiders. It appears that Class V would have voted for the Plan were it not for the efforts of Mass Mutual to reshape the voting.

As ballots were being distributed to creditors in early June, 1993, attorneys for Mass Mutual made a concerted effort, through calls and mailings, to garner additional votes for the rejection of the Plan. As a result of Mass Mutual's efforts, it was able to obtain six additional votes (four in Class V and two in Class IV) by purchasing the claims of unsecured creditors for their full value. Mass Mutual then elected to switch the two claims from Class IV to Class V by reducing the claim to $1,000. Consequently, Mass Mutual was able to swing the voting in class V to a rejection of the Plan. Mass Mutual cast six rejection votes in Class V, leaving

only one vote of acceptance.[7] In total, Mass Mutual casted votes in opposition to the Plan that resulted in its rejection by Classes II, III and V.

Both parties presented arguments at hearings held on October 22 and 25, 1993, November 1, 1993, and December 17 and 20, 1993, pertaining to the confirmation of the Plan.[8] Throughout these proceedings, the Debtor seeks to "cram down" its Plan pursuant to § 1129(b) of the Bankruptcy Code. Mass Mutual claims that the requirements of § 1129 have not been satisfied because the Plan is not in the best interest of creditors, the cram-down requirements of § 1129(b) have not been met, and the Plan is not feasible. In the alternative, Mass Mutual argues that 1129(b) is not applicable because the Plan has not been accepted by at least one Class of creditors, as required by § 1129 of the Bankruptcy Code, and because the Plan was proposed in bad faith.

## II. *ARTIFICIAL IMPAIRMENT OF THE CITY TAX LIEN*

■ A threshold issue that must be resolved is whether the City's claim is properly impaired pursuant to § 1129(a)(10) of the Bankruptcy Code which requires at least one impaired consenting class. If it is not, this Court need not reach the other confirmation issues in this case.

Mass Mutual has opposed the vote of the City at other times during the confirmation process. Hearings have previously been held on the issue of whether the City's vote was properly solicited. This Court has determined that it was properly solicited and allowed the City's vote.

This Court must now consider whether the tax lien is properly impaired to determine whether the City's affirmative vote on the plan will be the necessary impaired class vote

7. The Debtor claims that one vote in Class V, that of Strauss Paper Co., should not be counted in opposition (which would alter the result to 5–2 in opposition) because the Debtor received an affirmative vote from Strauss on June 24, 1993 which was changed by Mass Mutual after they purchased Strauss' claim and submitted a negative vote on the next day. In light of the larger issue in this case, i.e., whether the claim pur-

chasing by Mass Mutual was proper, we find this issue to be of little influence to this Court's decision.

8. This Court reserved decision on this matter in the belief that the parties were negotiating a settlement and continued to believe that negotiations were ongoing until 1994.

for the purposes of § 1129(a)(10). For the reasons set forth below, this Court determines that it is properly impaired; thus, allowing the Debtor access to "cram-down" pursuant to § 1129(b) of the Bankruptcy Code.

In the seminal opinion, the Eighth Circuit held that "for the purposes of section 1129(a)(10), a claim is not impaired if the alteration of the rights in question arises solely from the debtor's exercise of discretion." *In re Windsor on the River Assoc., Ltd.,* 7 F.3d 127, 132 (8th Cir.1993).

Mass Mutual directs this Court's attention to the fact that Simone has agreed, and is still willing, to pay the NYC Lien in full.[9] Since Simone is willing to pay 100% of the tax lien in exchange for a 30% equity in the Property, Mass Mutual argues that Class I is artificially impaired because it is within the discretion of the Debtor to pay 100% of the NYC Tax Lien.

However, the cases Mass Mutual relies upon are distinguishable in that they mostly pertain to debtors who delay payment for a relatively brief period of time after the plan becomes effective or pay 99% of the claims in order to create an impaired class that will accept the plan.[10] To be sure, this type of impairment is "de minimis", especially when the debtor has sufficient funds to pay the claims on the effective date of the plan.

In this case, it is not entirely within the Debtor's discretion to pay the City's lien in full. First, the Debtor itself does not have the ability to make such payments. Second, while Simone did agree to pay 100% of the NYC Lien, the Debtor was under the obligation to negotiate with the City for the least amount that the City would take to satisfy its lien. Moreover, the City will never see the 5% of the tax lien (plus interest) that it has voluntarily negotiated for and agreed to forfeit. Although as a percentage, a 5% impairment may—on the surface—appear to be insignificant, 5% of approximately $1.0 million amounts to $50,000 in absolute amounts. Certainly, $50,000 is not a "de minimis" amount. Accordingly, this Court finds that the Plan comports with § 1129(a)(10) of the Bankruptcy Code.[11]

## III. CREDITING THE DEBTOR'S POST-PETITION PAYMENTS TO MASS MUTUAL

■ Prior to addressing the "cram-down" requirements, this Court must resolve the dispute over the amount of Mass Mutual's secured claim. This entails deciding the allocation of post-petition payments made to Mass Mutual pursuant to the Cash Collateral Order. The Debtor claims that its post-petition payments[12] to Mass Mutual should

---

9. Trial Tr. at 234–235.

10. *E.g., In re Windsor on the River Assocs., Ltd.,* 7 F.3d 127 (8th Cir.1993); *In re Willows Convalescent Centers Ltd. Partnership,* 151 B.R. 220 (D.Minn.1991); *In re Kellogg Square Partnership,* 160 B.R. 343 (Bankr.D.Minn.1993); *In re Miami Center Assocs., Ltd.,* 144 B.R. 937 (Bankr. S.D.Fla.1992); *In re Club Assocs.,* 107 B.R. 385 (Bankr.N.D.Ga.1989); *In re Lettick Typografic, Inc.,* 103 B.R. 32 (Bankr.D.Conn.1989); *In re Meadow Glen, Ltd.,* 87 B.R. 421 (Bankr.W.D.Tex. 1988).

11. There is an issue as to whether the Plan's classification scheme is proper because the Debtor separately classified Mass Mutual's unsecured deficiency claim from all other unsecured claims. Classification of claims under a plan is governed by § 1122 of the Bankruptcy Code. Section 1122 only prohibits a plan proponent from classifying dissimilar claims in the same class and does not specify if similar claims may be classified in different classes.

However, courts have overwhelmingly held that separate classification of an unsecured cred-

itor's deficiency claim is not allowed if motivated solely by an attempt to create an impaired class of creditors. *In re D & W Realty Corp.,* 165 B.R. 127 (S.D.N.Y.1994); *In re One Times Square Assocs. Ltd. Partnership,* 159 B.R. 695 (Bankr. S.D.N.Y.1993), *aff'd,* 165 B.R. 773 (S.D.N.Y. 1994), *aff'd,* 41 F.3d 1502 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1107, 130 L.Ed.2d 1072 (1995). Since the Debtor has not demonstrated any legitimate business reasons for the separate classification of Mass Mutual's unsecured deficiency claim, this Court finds the Plan's classification scheme to be improper.

12. The payments to Mass Mutual comprise of "net rents" only, representing the difference between gross rents and the operating expenses of the building as agreed upon by the parties in the Cash Collateral Order. Because the issue of whether Mass Mutual is entitled to gross or net rents is not raised by the parties before us, we have no need to consider several cases raised by the Debtor that were pertinent to this point. *See, In re Cardinal Indus.,* 118 B.R. 971 (Bankr. E.D.Ohio 1990); *In re 499 W. Warren St. Assocs.,*

be applied against the secured portion of Mass Mutual's claim.[13] The Debtor argues that because the value of the Property has increased[14] since the date of filing of this case, Mass Mutual has been adequately protected and should not be allowed to keep the cash payments made by the Debtor without a corresponding reduction in the amount of its secured claim.

Mass Mutual counters that its interest in the rents is separate from its mortgage on the Property and, therefore, the payments should not be credited against its lien which was determined in reference to the value of the Property. This issue is important to the Debtor's Plan because it directly affects feasibility. If the payments are credited against Mass Mutual's secured claim, an immediate "equity cushion" is created that can be used by the Debtor to provide Mass Mutual with "payments totaling at least the present value of its allowed claim as of the date of confirmation of the plan." 11 U.S.C. § 1129(b).

Unfortunately, there is no Second Circuit case on point. However, the Second Circuit stated in *In re Vienna Park* that "rents ... are 'cash collateral' when they are 'subject to a security interest as provided in section 552(b),' " recognizing that § 552(b)[15] "creates an exception to the general rule that proper-

ty acquired by the estate after the commencement of bankruptcy is not subject to any security interest arising from an agreement entered into prior to the commencement of the bankruptcy case." *In re Vienna Park Properties,* 976 F.2d 106, 111–12 (2d Cir.1992). There is no dispute between the parties that the assignment of rents is perfected.[16] Therefore, the rents in this case constitute cash collateral in which Mass Mutual has a security interest.

Analysis of the issue must begin with the sound premise that money paid by the Debtor during the pendency of the case must be applied against some portion of Mass Mutual's claim. *See, In re Oaks Partners, Ltd.,* 135 B.R. 440 (Bankr.N.D.Ga.1991). The question remains, however, whether payments will be applied against the total amount of the claim or the secured portion, since either solution will fulfill the *Oaks* mandate.[17]

In support of its argument that the payments should reduce Mass Mutual's secured claim, the Debtor refers this Court to *United Sav. Assn. of Texas v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), where the creditor not only sought adequate protection of its security interest in rents, but also lost opportunity costs from its property that it had foregone

142 B.R. 53 (Bankr.N.D.N.Y.1992); *In re Willowood East Apts. of Indianapolis II, Ltd.,* 114 B.R. 138 (Bankr.S.D.Ohio 1990); and *In re Pine Lake Village Apt. Co.,* 16 B.R. 750 (Bankr.S.D.N.Y. 1982).

13. The Order specifically provided that it was "subject to a reservation of rights as to the application of the payments."

14. The Debtor bases this assumption on the increase in the stipulated value of the Property between the two parties. Originally in this case, the parties stipulated a $7,350,000 value and later to a value of $7,650,000.

15. § 552(b)(1) of the Bankruptcy Code provides in relevant part that:

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or

profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(1).

16. Joint Pretrial Order at 4–5.

17. The court in *Oaks* indicated that it was wrestling with the bank's argument that it was entitled to keep the net rents and not apply it to any portion of its claim. The court specifically stated that it was not deciding whether the rents had to be valued separate and apart from the real estate in fixing the amount of the bank's allowed secured claim. Although the court indicated that it leaned toward reducing the secured portion of the claim, it never formally addressed the issue. Thus, the only holding applicable to this case is that referred to above. *Id.* at 451.

during the existence of the automatic stay.[18] In *Timbers,* the Supreme Court unequivocally announced that the creditor was not allowed to collect any "use value" under § 362(d) on its property during the time when the automatic stay was in place. In dicta, the Supreme Court stated:

> Section 552(b) therefore makes possession of a perfected
>
>> security interest in post-petition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of unsecured creditors. Under petitioner's interpretation, however, the undersecured creditor who lacks such a perfected security interest in effect achieves the same result by demanding the "use value" of his collateral under § 362.

*Id.* at 374, 108 S.Ct. at 632.

The Debtor would have this Court read *Timbers* as prohibiting any payments from the Debtor to Mass Mutual where the Property value is not decreasing unless Mass Mutual applies such payment against the secured portion of its claim. In support of this view, Debtor cites two cases that have interpreted *Timbers* in a similar fashion—*Matter of IPC Atlanta L.P.,* 142 B.R. 547 (Bankr. N.D.Ga.1992), and *In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809 (Bankr. D.N.M.1990). The respective courts in *IPC Atlanta* and *Reddington/Sunarrow* held that the payments of a debtor to an undersecured creditor pursuant to a perfected assignment of the rents should be used to reduce the secured portion of the claim. These opinions relied on *Timbers,* but failed to address the ramifications of § 552(b).

In *Reddington,* the court was faced with a lift stay motion by a creditor who held a first lien on both the property and the rents. Relying on § 506 of the Bankruptcy Code and its interpretation of the court in *Timbers,* the court ruled that post-petition payments by the debtor to the creditor should be used to reduce the secured portion of the claim. The court reasoned that if the payments were used to reduce the creditor's unsecured deficiency claim, the creditor would in fact be paid "use value" in violation of *Timbers* and § 506. 119 B.R. at 813. The *Reddington* court distinguished cases that had separately protected an interest in rents by contrasting the intent of parties who entered into the Cash Collateral Agreement. *Id.*

The reasoning in *IPC Atlanta* was nearly identical. The *IPC Atlanta* court relied heavily upon *Reddington* and a previous case decided in the same district. *See In re Beau Rivage Ltd.,* Case No. A89–13866 (Bankr. N.D.Ga.1990), *aff'd,* 126 B.R. 632 (N.D.Ga. 1991). The court opined that if the creditor was not required to deduct payments from the secured amount it would somehow be able to recoup more than the total amount of its claim, meaning the total amount of the creditor's secured claim would have grown during the pendency of the case. The court held that this would be in violation of § 506 and the Supreme Court's reasoning in *Timbers.*

What these decisions fail to address is the fact that an assignment of rents represents a security interest is distinct and separate from the mortgage on the real estate.[19] As

---

18. Debtor also cites several cases merely for the proposition that post-petition payments which exceed the depreciation of the collateral should be credited to the secured portion of the claim. *See In re Maun,* 95 B.R. 94 (Bankr.S.D.Ill.1989); *Matter of Kain,* 86 B.R. 506 (Bankr.W.D.Mich. 1988); *In re Canaveral Seafoods, Inc.,* 79 B.R. 57 (Bankr.M.D.Fla.1987). Where, as in this case, a separate security interest exists, these cases are distinguishable.

*In re Spacek,* 112 B.R. 162 (Bankr.W.D.Tex. 1990), is also relied upon by the Debtor. This case might be helpful were it not for the fact that the opinion fails to identify the reason for the payments. It is unclear whether they represent

proceeds encumbered by a security interest governed by § 552 or whether they were payments from another source to protect against the depreciation of the underlying property.

19. This was also the case in *In re B & B West 164th Corp.,* 147 B.R. 832 (Bankr.E.D.N.Y.1992), upon which the Debtor relies. In that case, § 552(b) was never addressed. Although the court was leaning toward deducting payments from the secured portion of the debt, the court never formally addressed the issue and, thus, the case is not relevant to the issue at hand. *See, also, In re Sherwood Square Assocs.,* 87 B.R. 388 (Bankr.M.D.1988).

*Timbers* implicitly recognized [20], each interest deserved equal protection. Other courts have been more explicit. *See In re Vermont Inv. Ltd. Partnership,* 142 B.R. 571 (Bankr. D.D.C.1992); *In re Financial Ctr. Assocs. of East Meadow, L.P.,* 140 B.R. 829 (Bankr. E.D.N.Y.1992) (creditor entitled to adequate protection of two distinct interests: its mortgage on the property and its right to collect rents flowing from the property or, at the very least its security interest on such rents); *Federal Nat'l Mortgage Ass'n v. Dacon Bolingbrook Assoc. L.P.,* 153 B.R. 204 (N.D.Ill. 1993) (Fannie Mae possesses a distinct, additional interest in the rents which must be adequately protected from a reduction in value; payments allowed for maintenance purposes with case remanded to determine amount that should be turned over).

It is this Court's opinion that the protection of the creditor's separate interest in rents is governed by § 552. In *Vermont Investment,* the court addressed whether post-petition payments by a debtor should be credited against the secured portion of the creditor's claim. In its analysis, the *Vermont Investment* court acknowledged the creditor's separate interests in the real property and the rents as well as the importance of § 552(b). The court found that because the mortgage and the assignment of rents were distinct interests of the creditor, payments made pursuant to a cash collateral order designed to protect an assignment of rents should not be deducted from the creditor's secured claim.

In *In re Bloomingdale Partners,* 155 B.R. 961 (Bankr.N.D.Ill.1993), the court also refused to deduct post-petition payments made pursuant to a cash collateral agreement [21]. The *Bloomingdale* court stated that "taken together, sections 506(a) and 552(b) require that [the creditor's] post-petition security interest in rents be added to its separate security interest in the Property" *Id.* at 976. The

court relied not only on *Timbers* and *Vermont Investment,* but also *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992), where the Supreme Court stated that "[a]ny increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain."

In *In re Flagler-at-First Assocs.,* 114 B.R. 297 (Bankr.S.D.Fla.1990), the court held that post-petition payments pursuant to a cash collateral order should not be deducted from the amount of the secured claim because the secured creditor was entitled to protection of its separate interests in the property and the rents.

The *Flagler* court based its holding on the sound notion that §§ 506(b) and 552(b) required protection for the creditor's interest in the property and the rents. *Flagler's* holding and reasoning are persuasive and applicable to the facts before this Court. Although some courts have gone to great lengths to distinguish *Flagler* from the facts before them [22], the facts in this case are not distinguishable. Courts that distinguish *Flagler* have done so by highlighting the fact that the parties in *Flagler* intended the payments to protect the interest in rents. It appears from the face of the Order in this case that the parties were aware that the payments served to protect Mass Mutual's interest in the rents. Finding "I" in the Cash Collateral Order provides, "Mass Mutual is entitled to adequate protection for the Debtor's use of the Cash Collateral" and similar wording is found in Paragraph 2 of the Court's orders.

Although the unsecured deficiency claim is indirectly reduced by the Debtor's post-peti-

---

**20.** 484 U.S. at 374, 108 S.Ct. at 632.

**21.** Although not expressly termed a "cash collateral agreement," the court states that the parties entered into an agreement that the debtor would provide the creditor with net rents or cash collateral.

**22.** See Bonnie Kay Donahue and W. David Edwards, *The Treatment of Assignments of Rents in Bankruptcy: Emerging Issues Relating to Perfection, Cash Collateral, and Plan Confirmation,* 48 Bus. Law. 633, 690 (1993).

tion payments,[23] this is not a violation of § 506 which prohibits post-petition payments to undersecured creditors. It must not be forgotten that the purpose of the cash payments is to protect a perfected security interest *in the rents*. As the *Bloomingdale* court stated, "if, for purposes of confirmation, additional security accrues post-petition, then post-petition payments merely may be agreed prepayments of a secured claim, not unpermitted payments to an undersecured creditor." 155 B.R. at 975.

If the payments were deducted, as the Debtor proposes, improper incentives would be created. As the court stated in *Vermont Investment*, deducting payments would create a "dramatic incentive for any secured creditor to bring a single asset reorganization case to a halt at the earliest possible moment, and would create a similar incentive on the part of the debtors to delay the case as long as possible in order to reduce the amount of the creditor's secured claim." 142 B.R. at 574. This is contrary to the Bankruptcy Code's intention to protect secured interests while affording a debtor adequate time in which to reorganize.

Accordingly, the post-petition payments by the Debtor to Mass Mutual should not be applied against the secured portion of its claim. Rather, the payments must be considered protection for the separate interest in the rents in accord with § 552(b) and be credited only against the total allowed amount of the claim, indirectly reducing the unsecured portion of Mass Mutual's claim.

## IV. *"FAIR AND EQUITABLE" AND THE INTEREST RATE*

▪ In a "cram-down" proceeding, the plan proponent bears the burden of showing by a preponderance of the evidence that the Plan satisfies all of the requirements of § 1129 of the Bankruptcy Code. *See, e.g., In re Cellular Information Systems, Inc.,* 171

B.R. 926 (Bankr.S.D.N.Y.1994); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 284 (Bankr.S.D.N.Y.1990); *In re Rusty Jones, Inc.,* 110 B.R. 362 (Bankr.N.D.Ill. 1990). The Debtor, as the plan proponent, has not met this burden and for the reasons that follow, the Plan cannot be confirmed.

A plan confirmed under the Bankruptcy Code's cram-down provisions must be "fair and equitable." Section 1129(b)(2)(A) defines this to mean that secured creditors: (1) "retain the liens securing such claims,"[24] and (2) receive "cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property" or the "indubitable equivalent of such claims."

As both parties acknowledge, the crucial issue in this analysis is the rate of interest to be paid. Since Mass Mutual will not receive payment of its claim immediately, this Court must decide what interest rate is appropriate in order to provide Mass Mutual with the present value of its interest. *See Rake v. Wade,* —— U.S. ——, —— n. 8, 113 S.Ct. 2187, 2192 n. 8, 124 L.Ed.2d 424 (1993) ("[w]hen a claim is paid off pursuant to a stream of future payments, a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments.").

Pursuant to the Plan, Mass Mutual will receive a Replacement Note with a five-year term in the full amount of its allowed secured claim that will: (a) provide a pay rate of interest at the rate of 8% per annum on the principal amount of the Replacement Note, and (b) be supplemented by either (i) a 50% participation in the net proceeds of a sale or refinancing of the Property or (ii) the 9%

---

**23.** The unsecured portion will be reduced because the overall claim of Mass Mutual will be reduced by the payments made, since the creditor is not allowed in any circumstances to receive more than the amount of its total claim. When the secured portion (based on the value of the property) is subtracted from the reduced total claim, the unsecured portion that remains is correspondingly reduced by the amount of the payment.

**24.** Neither party claims that Mass Mutual will not retain its lien under the terms of the Plan. This Court will therefore focus on the second requirement of § 1129(b)(2)(A).

Accrual Option, an additional 1% of the principal amount of the Replacement Note per annum as additional accrued interest payable upon the later of sale or refinance of the Property or the maturity of the Replacement Note at the expiration of five years.[25] The Plan does not propose to amortize the principal of the loan. Payments made during the five-year duration of the note will cover only the interest accrued, with all principal being paid through a balloon payment at the time of sale or refinancing or at the end of the five-year term.

■ Therefore, this Court must determine whether the 8% pay rate in combination with the other elements of the Plan will provide Mass Mutual with the present value of its allowed secured claim. In other words, we must ask whether the proposed rate of interest is a "market rate." Most courts agree that the market rate is the rate which should be approximated. Of course, there are many markets and choosing which is the appropriate market to simulate is a difficult task. *See, In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549, 553 (Bankr.W.D.Ark.1990) ("although it is clear that the discount rate should reflect 'the prevailing market rate of interest', determining how that rate should be calculated is not so clear.").

■ The Debtor in this case argues that the market rate which this Court should attempt to approximate is the market rate for work out loans. *See In re Stratford Assocs. Ltd. Partnership*, 145 B.R. 689, 703 (Bankr.D.Kan.1992); *In re Landing Assocs.*, 157 B.R. 791, 821 (Bankr.W.D.Tex.1993). A work-out loan usually consists of a lower interest rate than a new loan because the lender agrees to lower the interest payment in hopes of getting some, rather than none,

of the bargained-for payments. However, in a work-out situation, the principal on the loan is usually not reduced. In this case, Mass Mutual has already had its note reduced from $17 to $7.6 million. To allow the Debtor to now use a work-out loan rate in its plan, after stripping Mass Mutual's lien, would be patently unfair. Therefore, because workout loans are not analogous to the situation faced in this case, this Court finds that the market for work-out loans is not appropriate.[26]

Many methods have been used to calculate an appropriate rate of interest under a bankruptcy plan, including but not limited to, the formula approach, the coerced loan approach, the "Mortgage–Equity/Band of Investment Analysis.".

Of course, even when a market to approximate has been decided upon, a recurring problem is that a market for a coerced loan is often non-existent, as is the case here. However, the approaches referred to above can each provide a means for the court to approximate what the market rate would be. *See, In re Eastland Partners Ltd. Partnership*, 149 B.R. 105, 111 (Bankr.E.D.Mich. 1992); *In re Villa Diablo Assocs.*, 156 B.R. 650, 653 (Bankr.N.D.Cal.1993) (providing that the formula approach is merely an alternative method to determining a market rate when no real market exists). Since both parties have essentially agreed upon the formula approach, and this Court finds the approach acceptable, it is the method that will be used to assess the Plan's proposed interest rate.

■ The formula approach takes a riskless cost of money, reflected by the interest rate paid for treasury notes,[27] to which is

---

**25.** Debtor's Post-trial Br. at 65.

**26.** The work-out situation is inappropriate for other reasons as well. Approving the work-out rate would allow a debtor to propose a lower rate of interest by simply making a small portion of its plan participatory. Not only would this be manipulative, allowing debtors to force creditors into involuntary partnerships with them, it would also allow the debtor to satisfy a lower rate of interest at the same time—a completely improper result.

**27.** The five year treasury note rate on the first day of the confirmation hearing was 4.75%. The current rate is 5.98%. Courts have used rates from different key dates in the proceedings as the relevant date. *See In re Landing Assocs.*, 157 B.R. 791 (using the date of confirmation hearing); *Kellogg Square Partnership*, 160 B.R. 343 (Bankr.D.Minn.1993) (using date of order confirming plan). Since this Court finds that either rate, when coupled with the required risk premium, makes the proposed interest rate insufficient, this opinion does not address which date should be used. In addition, it is recognized that

added a premium based on the "term, quality of security, and risk of repayment or financial condition of the borrower," *see In re One Times Square Assocs. Ltd. Partnership,* 159 B.R. at 706, and the physical, financial and personal factors relating to the quality of the security and the risk of future default. *See Kellogg,* 160 B.R. at 366. Included therein is also a measure of profit which is provided to the creditor who is forced by the Debtor's plan to maintain what is essentially a borrower/lender relationship. *See General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 69 (3d Cir.1993); *In re Busconi,* 147 B.R. 54, 55, (Bankr.D.Mass.1992); *In re Cassell,* 119 B.R. 89 (W.D.Va.1990). *But see In re Oaks Partners, Ltd.,* 135 B.R. at 445.

■ Addressing these elements in this case, this Court finds that the proposed interest rate is too low. The Debtor's Plan calls for a balloon payment at the end of five years with no amortization of principal during that time. The Debtor argues that this time frame is short and poses little potential risk. Mass Mutual will receive interest payments only while encountering much of the risk involved in the Debtor's new operation. While the non-amortization of principal does not render the Plan unacceptable, it does increase the amount of the risk premium that is necessary to provide present value. *See, General Motors Acceptance Corp.,* 999 F.2d at 69. Likewise, the relatively high loan to value ratio in this case, which is approximately 85%, increases the risk factor.

Moreover, the Debtor has the option of whether to refinance or sell the property. This exclusive right takes away some of the control and consequently increases the risk to Mass Mutual. According to the Debtor itself, there is also a distinct possibility that under certain scenarios—if $6,650,000 was Mass Mutual's replacement loan, a refinance at 75% loan-to-ratio was required and according to certain of the Debtor's conservative assumption—a shortfall of $110,000 would result.[28]

In light of these factors, we find that a risk factor of at least 425 basis points would be necessary to provide Mass Mutual with the present value of its money. The Plan would have to provide a *minimum* interest rate of 9.43% to approach a confirmable rate.

This minimum rate was confirmed by expert testimony at trial. Mr. Estreich testified that 500 to 575 basis points would have to be added to the T–Bill[29] rate in order to approximate a market rate of interest. (Tr. at 538). Mr. Klett, an expert who testified for the Debtor, did not address the interest rate for a new loan of this type other than to say that no such market existed. (Tr. 300–318). However, based on the numbers Klett provided, one can extrapolate that at least 425 basis points added to the T–Bill rate would be roughly appropriate.[30]

Since the 8% pay-out rate under the Plan (or even the 9% option which is payable five years down the road at the earliest) does not provide Mass Mutual with the present value of its secured claim, the Plan cannot be confirmed.

## V. *THE BEST INTEREST OF CREDITORS*

Section 1129(a)(7) requires that a Plan be in the "best interests of creditors" for purposes of a "cram-down." This means that a plan must provide that a creditor receives or retains property under the plan which is not less than the value it would receive under a Chapter 7 liquidation of the debtor. 11 U.S.C. § 1129(a)(7)(A)(i) and (ii). *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 761 (Bankr.S.D.N.Y.1992); *In re*

---

the lengthy delay between the hearing and the filing of this opinion makes it more difficult to choose which rate to apply. The earlier date allows notice to the Debtor attempting to craft a plan while the latter is the more accurate in terms of the actual market on the effective date of the Plan.

**28.** Debtor's Post–Trial Br., fn. 22.

**29.** Treasury bills are short-term with a maturity date less than one year, where as, treasury notes have a maturity of one to ten years. *See* Black's Law Dictionary (6th ed. 1990).

**30.** For instance, Mr. Klett testified that the interest rate for a new loan on a commercial office building with a loan-to-value ratio of 50–60% would be roughly 300–350 basis points above the T–Bill rate. Tr. at 315.

*Downtown Inv. Club III,* 89 B.R. 59, 65 (9th Cir.1988). This so-called "best interest of creditors" test "is perhaps the strongest protection creditors have in Chapter 11." *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 297 (Bankr.S.D.N.Y.1990).

## A. Unsecured Creditors

■ Mass Mutual asserts that the Plan does not satisfy the "best interests of creditors" test for several reasons. As a holder of several unsecured, recourse claims, Mass Mutual claims that the test is not met because this class of creditors would have recourse against the partners in a Chapter 7 liquidation pursuant to 11 U.S.C. § 723(a). *In re Notchcliff Assocs.,* 139 B.R. 361, 372 (Bankr.D.Md.1985); *In re The Monetary Group,* 55 B.R. 297, 299 (Bankr.M.D.Fla. 1985); *In re I–37 Gulf Ltd. Partnership,* 48 B.R. 647, 650 (Bankr.S.D.Tex.1985). However, the Plan provides only a 99% payment to these creditors.

Although 99% is clearly numerically less than 100%, these same creditors can opt to retain their recourse against the former partners and still receive a 2% payment on their claims. Thus, they will have exactly the same remedy they would have in a Chapter 7 liquidation, plus a 2% payment on their claim. Mass Mutual counters that the retention of their recourse would not be equivalent to retention of recourse in a liquidation under chapter 7 and cites *In re Heron, Burchette, Ruckert & Rothwell,* 148 B.R. 660, 682 (Bankr.D.D.C.1992), for the proposition that the Debtor has to provide a mechanism under the plan to ensure that claims against the partners are brought on behalf of the estate. This is necessary, Mass Mutual asserts, because the trade claims are too small to warrant bringing their own actions.

Mass Mutual further asserts that under chapter 7, the general partners would be liable for the full deficiency and that costs associated with the litigation by the creditors would be borne by the general partners. *See,* 11 U.S.C. § 723(a); House report No. 95–595, 95th Cong. 1st Sess. 381 (1977); Senate Report No. 95–989, 95th Cong.2d Sess. 95

(1978); *In re CS Assocs.,* 160 B.R. 899, 909 (Bankr.E.D.Pa.1993), *aff'd,* 167 B.R. 368 (E.D.Pa.1994); *In re Miramar Mall Ltd. Partnership,* 152 B.R. 631, 633 (Bankr. S.D.Cal.1993). Moreover, Mass Mutual asserts that payment in full includes payment of interest at the legal rate from the date of filing. *See,* 11 U.S.C. § 726(a)(5).

This Court finds Mass Mutual's argument to be persuasive. Retention of the unsecured recourse creditors' rights against the partners does not constitute payment in full pursuant to chapter 7. Accordingly, this Court finds that the Plan does not satisfy the best interests of creditors test with regard to unsecured creditors with recourse.

## B. Best Interest of the Secured Creditor's Claim

Mass Mutual further argues that the treatment of its secured claim under the Plan does not satisfy the test. The crux of the issue is the Debtor's accuracy of its liquidation analysis and the rate of interest proposed to be paid under the Plan.

Mass Mutual argues that the Debtor's liquidation analysis, as to its secured claim, is so flawed that the Plan does not satisfy the best interests test as required pursuant to § 1129(a)(7)(A)(ii) of the Bankruptcy Code. The Debtor has conceded that its liquidation analysis contained certain errors. For example, it concedes that it properly charged over $760,000 in expenses to Mass Mutual [31] and that the liquidation analysis failed to reflect the revised stipulated value of the Property.[32] Mass Mutual also asserts that the Debtor's liquidation analysis is flawed because it did not contain a liquidation analysis of the refinance option contained in the Plan. While the Debtor has attempted to address such deficiencies in its Post–Trial Reply Brief, Mass Mutual has urged this Court not to consider the Debtor's offer of a new liquidation analysis without an opportunity for Mass Mutual to examine the Debtor's new analysis. While this Court is inclined to agree with Mass Mutual that the Debtor has failed to meet its burden pertaining to this

---

**31.** Tr. at 441–445.

**32.** Debtor's Post–Trial Reply Br. at 32.

issue, in light of this Court's ruling regarding the other aspects of this Plan, there is no need to rule on this issue.

## VI. THE FEASIBILITY OF THE PLAN

■ The plan proponent has the burden of showing that the plan is feasible, as required by § 1129(a)(11). *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 284 (Bankr.S.D.N.Y.1990). Gramercy has not met this burden. Based upon this Court's previous findings, the interest rate proposed by the Plan is insufficient and the protection payments cannot be credited against the secured portion of the debt.

The Plan is not feasible for another reason. It does not provide for repayment of Mass Mutual's payment of administrative expenses from its cash collateral. During the pendency of this case, over Mass Mutual's objections, this Court has allowed the Debtor to pay, on an interim basis, its professional fees and expenses. However, this Court had reserved judgment as to whether the cash collateral may be used. While there has been no final hearing on this issue, this Court is persuaded that the Debtor will have to return approximately $385,000 so previously charged. *See, In re Grant Assocs.*, 154 B.R. 836, 841–42 (S.D.N.Y.1993); *In re 680 Fifth Avenue Assocs.*, 154 B.R. 38 (Bankr.S.D.N.Y. 1993). As this contingency was not provided for in the Debtor's Plan, this failure negatively impacts upon the Plan's feasibility.

## VII. NEW VALUE EXCEPTION TO THE ABSOLUTE PRIORITY RULE

Mass Mutual contends that the new value exception to the absolute priority rule did not survive the enactment of the Bankruptcy Code and that even if it did, its requirements are not satisfied by the Debtor's Plan. This Court finds merit in the latter contention, but not the former.

■ In *In re One Times Square*, 159 B.R. 695 (Bankr.S.D.N.Y.1993), *aff'd* 165 B.R. 773 (S.D.N.Y.1994), *aff'd* 41 F.3d 1502 (2d Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1107, 130 L.Ed.2d 1072 (1995), and *In re Woodmere Investors Ltd. Partnership*, 178 B.R. 346 (Bankr.S.D.N.Y.1995), this Court has already addressed whether the new value exception to the absolute priority rule survives the enactment of the Bankruptcy Code and has concluded in the affirmative.[33]

Although this Court recognizes the continued vitality of the new value exception to the absolute priority rule, its requirements have not been satisfied in this case.

■ In order to constitute "new value," the old equity holders must contribute capital that is new, substantial money or money's worth, necessary for a successful reorganization and reasonably equivalent to the value or interest received. *In re Bonner Mall*, 2 F.3d 899, 908 (9th Cir.1993); *In re One Times Square*, 159 B.R. at 707–708.

■ Mass Mutual alternatively argues that if the new value exception exists, then the old equity's contribution is not reasonably equivalent to the value or interest received. The Participating Partners will contribute $500,000 for retention of 70% of the equity. Mass Mutual argues that the actual amount contributed is much less than the $500,000 because $250,000 of the $500,000 will be dedicated to payment of administrative expenses, to the extent allowed. If these expenses are not allowed, then the contribu-

**33.** This Court is joined by a host of others who have reached a similar conclusion. *See In re SM 104 Limited*, 160 B.R. 202 (Bankr.S.D.Fla.1993); *In re S.A.B.T.C. Townhouse Ass'n., Inc.*, 152 B.R. 1005, 1009 (Bankr.M.D.Fla.1993); *In re Wynnefield Manor Assocs.*, 163 B.R. 53 (Bankr.E.D.Pa. 1993); *In re Eitemiller*, 149 B.R. 626, 630 (Bankr.D.Idaho 1993); *In re F.A.B. Indus.*, 147 B.R. 763 (Bankr.C.D.Cal.1992); *In re Albrechts Ohio Inns, Inc.*, 152 B.R. 496 (Bankr.S.D.Ohio 1993); *In re Ropt*, 152 B.R. 406 (Bankr.D.Mass. 1993); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 717 (Bankr.M.D.Tenn.1992); *In re Tallahassee Assocs.*, 132 B.R. 712 (Bankr.W.D.Pa.1991);

*In the Matter of Route 37 Business Park Assocs.*, 146 B.R. 640, 647 (D.N.J.1992), *rev'd on other grounds* 987 F.2d 154 (3d Cir.1993); *FGH Realty Credit v. Newark Airport/Hotel Ltd. Partnership*, 155 B.R. 93 (D.N.J.1993); *In re SLC Ltd. V*, 137 B.R. 847, 855 (Bankr.D.Utah 1992); *In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir.1986); *In re Woodscape Ltd. Partnership*, 134 B.R. 165 (Bankr.D.Md.1991); *In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr.D.Mass.1991); *In re Professional Dev. Corp.*, 133 B.R. 425 (Bankr. W.D.Tenn.1991); *In the Matter of VIP Motor Lodge, Inc.*, 133 B.R. 41 (Bankr.D.Del.1991).

tion will not be made. This Court agrees with Mass Mutual that a promise of future payment is insufficient to constitute new value. *See, Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 204, 108 S.Ct. 963, 967, 99 L.Ed.2d 169 (1988). Accordingly, such portion of the $500,000 contribution will not be considered part of the "new value."

▮ Additionally, Mass Mutual asserts that the remaining $250,000 to be contributed will be dwarfed by the benefits to be received by the partners pursuant to the Plan. For example: (1) they will receive $30,000 as a distribution under the Plan for their prepetition claims; (2) an entity owned by the partners will manage the Property and receive a 4% annual management fees pursuant to the Plan; (3) the Debtor will accrue an interest obligation to the partners at 8% on the entire $500,000 contribution. While this Court disagrees that the management fees to be received by the entity affiliated with the partners should be counted against the old equity's contribution, this Court is in agreement with Mass Mutual that the old equity's contribution amount is not reasonably equivalent to the 70% interest received. Such contribution by the Participating Partners is also not "substantial." [34]

▮ The Debtor argues that the contribution by the Participating Partners and Simone should be considered in total when determining the adequacy of the "new value," citing *In re Bjolmes Realty Trust,* 134 B.R. at 1010; *In re Marston Enterprises, Inc.,* 13 B.R. 514, 518 (Bankr.E.D.N.Y.1981); and *In re Woodscape Ltd. Partnership,* 134 B.R. at 167.

This Court is not persuaded by the rationale of these cases but is instead persuaded by the case relied upon by Mass Mutual. *See, Case v. Los Angeles Lumber Products,* 308 U.S. 106, 122, 60 S.Ct. 1, 10–11, 84 L.Ed. 110 *reh'g denied,* 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939) ("we believe that to accord 'the creditor of his full right of priority against the corporate assets' where the debtor is insolvent, *the stockholder partic-ipation* must be based on a contribution in money, or money's worth....") (emphasis added); *In re Bonner Mall,* 2 F.3d at 909 ("in evaluating whether a reorganization plan satisfies the requirements of the new value exception a court is in fact determining whether *old equity* is unjustifiably attempting to retain its corporate ownership powers in violation of the absolute priority rule....") (emphasis added); *In re Blankemeyer,* 861 F.2d 192, 194 (8th Cir.1988) ("it is incumbent upon the debtors to show that any dissenting unsecured creditor would be provided for in full before any junior class of unsecured creditors could receive or retain any property under the plan, unless *the junior class* contributed something reasonably compensatory....") (emphasis added); *In re F.A.B. Industries,* 147 B.R. at 769 (the new value exception "is a judicially created rule to deal with the circumstances under which *old equity* can participate in a new plan....") (emphasis added).

If a new participant is allowed to purchase an equity interest in a reorganized debtor based upon the new value exception when a dissenting major creditor strenuously objects to the confirmation of the Plan, then this Court believes that it would be inequitable in this case. The new investor could as easily seek Court approval for his purchase of an interest in the reorganized debtor pursuant to § 363 of the Bankruptcy Code. Through such a process, the creditors will be given due process to voice any objections to any new entity wishing to participate in the Plan process. This is not to say that Simone's contribution is insubstantial in this case. Clearly, $1.0 million is a substantial contribution; however, for the purposes of satisfying the "new value" exception, his contribution should not be counted towards the contribution of the old equity.

Accordingly, the Participating Partners' contribution does not satisfy the new value exception and the Plan cannot be confirmed because it violates the absolute priority rule.[35]

---

34. This contribution is especially inadequate in light of the amount of the unsecured claims in this case. Mass Mutual alone holds over $11 million in unsecured claims.

35. In light of this Court's holding thus far, this Court need not reach the issue raised by Mass Mutual that the Plan was proposed in bad faith.

## VIII. CONCLUSION

For the aforementioned reasons, the Debtor's Plan cannot be confirmed. Thus, the automatic stay is further modified to allow Mass Mutual to execute on its judgment of foreclosure.

Mass Mutual is to settle an order consistent with this decision on five (5) days notice.

If this Court were to decide this issue, it is    unlikely to find evidence of bad faith.