**BANK OF AMERICA, ILLINOIS,**
Appellant,

v.

**203 NORTH LASALLE STREET PARTNERSHIP, an Illinois Limited Partnership, Appellee.**

**Bankruptcy Nos. 95 C 7144, 96 C 0238.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 1, 1996.

Thomas S. Kiriakos, Mayer, Brown & Platt, Chicago, IL, for Bank of America, Illinois.

Richard Marcus Bendix, Jr., Paul Joseph Gaynor, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, Marc Wilkow, Chicago, IL, for 203 North LaSalle Street Partnership.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

The Appellant Bank of America, Illinois (the "Bank") appeals from three orders entered by the United States Bankruptcy Court for the Northern District of Illinois (Honorable Eugene Wedoff) in the underlying Chapter 11 case of 203 North LaSalle Street Partnership (the "Debtor"): an order (the "Confirmation Order") confirming over the objection of the Bank, the Debtor's major creditor, the Debtor's Second Amended Plan of Reorganization Dated September 11, 1995 as modified (the "Plan"), *In re 203 North LaSalle Street Limited Partnership,* 190 B.R. 567 (Bankr.N.D.Ill.1995); and two orders denying the Bank's motion for relief from the automatic stay and the Bank's motion to convert the Debtor's Chapter 11 case to one under Chapter 7 of the Bankruptcy

Code (the "Code").[1] The Debtor also moves to dismiss the Bank's appeal as moot. For the reasons set forth below, we deny the Debtor's motion to dismiss the appeal and affirm the orders of the bankruptcy court in all aspects.

### Background

We summarize the bankruptcy court's findings of fact, set forth in it Memorandum of Decision, 190 B.R. 567 ("Bk.Dec.") as follows.

The Debtor is an Illinois limited partnership that owns the upper fifteen floors of office space (the "Property") in a building in the central business district of Chicago. The lower floors are separately owned. The Property is encumbered by a lien in favor of the Bank that secures a nonrecourse note in the principal amount of $92,582,000. The note became due and payable, according to its terms, on January 3, 1995. The debtor was unable to pay the note at that time, and the Bank commenced a state court foreclosure action on January 20, 1995. In response, the debtor filed this bankruptcy case on March 13, 1995. At that time, the Bank's claim, principal and interest, was $93,013,612. Several smaller claims were outstanding at the time of filing: (a) a state property tax claim of about $2.3 million; (b) general unsecured trade debt of about $160,000; (c) unsecured insider claims of $7.7 million (of which $6.8 million is a claim of the Debtor's general partner for an unsecured loan); and (d) a second mortgage held by the Debtor's general partner in the amount of $11.3 million. After the filing, the Debtor's general partner purchased some of the trade claims, reducing the general unsecured claims held by non-insiders to about $90,000. In addition to its real property, the Debtor holds the right to a cash account, consisting of prepetition rents, that at the time of confirmation held approximately $3.1 million.

The Debtor proposed its original plan of reorganization on April 13, which was subsequently amended on May 12. After briefing and a hearing, the bankruptcy court denied

confirmation of the plan on August 7. The principal ground for the ruling was unfeasibility: the minimum interest rate that the court found to be required for payment of the Bank's secured claim could not be supported by the projected cash flow of the Property. However, because the question of the appropriate interest rate was an unsettled legal issue, the court allowed the Debtor an opportunity to amend its plan. After several revisions, the debtor proposed the plan dated September 11. The court again held a hearing and ultimately confirmed the Plan in an order dated December 6, 1995.

The principal factual dispute between the parties concerned the value of the Property and the cash flow it was likely to generate. Both the Debtor and the Bank presented expert appraisal testimony on these issues, and the experts agreed that the most appropriate valuation method was discounted cash flow. This technique operates in three steps. First, the appraiser estimates the cash flow that the property will generate each year of a several year holding period. Next, the appraiser determines the "reversionary" value of the property at the end of the period by capitalizing a stabilized income that is estimated to produce at that time. Finally, using an appropriate discount rate, the appraiser reduces the values derived in the first two steps to present values and combines them to arrive at the value of the property. The bankruptcy court accepted the discounted cash flow method. Thus, to arrive at a value of the property, it was necessary to: (1) estimate net cash flows over an appropriate holding period; (2) determine an appropriate capitalization rate for the reversion; and (3) determine an appropriate discount rate.

Each of the appraisers chose a period of ten years for estimating annual cash flow, then capitalized a stabilized income for the eleventh year. The appraisers differed, however, in their estimates of income and in the capitalization and discount rates they applied. The Debtor's appraiser applied a higher discount rate (14.367%) to overall higher income estimates; the Bank's appraiser used both a

---

1. Unless otherwise specifically noted, all section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

lower discount rate (11.75%) and lower income estimates. The Debtor's estimated cash flow for the ten years was $58.285 million leading to a present value of $28.628 million. The Bank's estimated cash flow was $48.077 million leading to a present value of $27.457 million—about $1.1 million lower than the Debtor's.

The appraisers also differed in their calculation of reversionary value, but the Debtor's valuation was about $4.8 million less than the Bank's. In sum, the Debtor arrived at an estimated value of $53.75 million, while the Bank arrived at an estimated value of $57.4 million.

The bankruptcy court did not accept either of these valuations. The future cash flows depend primarily on the renewal of leases. The Property is currently nearly fully leased, but two leases to major tenants will expire during the ten year period. The debtor negotiated a renewal of one of these leases, to Rudnick & Wolfe, contingent on confirmation of the Plan, and that renewal is reflected in the appraisers' estimates of cash flow. However, the other major tenant, Coopers & Lybrand, has not agreed to renew its lease. The Bank's appraiser treated this tenant's lease in the same way as other smaller tenants, estimating a 50% chance of renewal. The Debtor's appraiser, on the other hand, assumed a one hundred percent chance of renewal and assumed highly favorable circumstances in that renewal. The bankruptcy court's assessment of the situation lay generally between those of the appraisers. It found that the size of the space occupied by the tenant and the paucity of available alternative space made it very likely that the tenant would renew, but that the importance of that tenant to the Debtor's operations would likely allow it concessions that would depress the debtor's cash flow under the renewed lease. Thus the court's estimate reflected no extraordinary loss at the time of the lease expiration, but lower income thereafter than suggested by either appraiser.

The bankruptcy court also found that the difference in capitalization and discount rates of the appraisers reflected their different approaches to income estimation. The Debtor's appraiser set both rates at the high end

of the spectrum of reasonable rates to reflect its view that the cash flow projections were somewhat risky, whereas the Bank's appraiser used lower rates to reflect its belief in the high quality of the building and perhaps the conservative estimate of cash flow. The court's view was that if income is properly estimated based on likely leasing results, the rates employed should be those of an average building of the Debtor's type—in this case, a first-class office building in the central business district. From data presented by the appraisers, the court took these rates to be a 10% terminal capitalization rate and a 12% discount rate.

Applying the 12% discount rate to future cash flows as found by the court, the court found a present value over the ten-year period of $30.0 million, as follows:

| Year Ending | Estimated Cash Flow (in $ thousands) | Present Value (discounted at 12%) |
|---|---|---|
| 1996 | 4,100 | 3,661 |
| 1997 | 5,700 | 4,545 |
| 1998 | 5,300 | 3,772 |
| 1999 | 5,700 | 3,621 |
| 2000 | 6,900 | 3,916 |
| 2001 | 7,300 | 3,698 |
| 2002 | 1,000 | 452 |
| 2003 | 3,800 | 1,538 |
| 2004 | 6,500 | 2,344 |
| 2005 | 7,700 | 2,479 |
| Total | 54,000 | 30,026 |

The court then calculated the present value of the reversion, based on stabilized income in the eleventh year of $8.2 million, capitalized at 10%, as $25.8 million, as follows:

| | |
|---|---|
| Estimated Stabilized Income (in $ thousands) | 8,200 |
| Capitalization Rate | .10 |
| Gross Reversionary Value | 82,000 |
| Estimated Disposition Cost | 1,845 (2.25%) |
| Net Reversionary Value | 80,155 |
| Discount Rate | .12 |
| Present Value | 25,806 |

The bankruptcy court thus calculated the value of the Property, at the time of the confirmation hearing, as $55.8 million.

The claims and interests in the Plan are divided into the following classes, of which classes 1 and 2 are unimpaired, and classes 3–7 are impaired:

Class 1: Priority Claims.

Class 2: Secured tax claims.

Class 3: Secured claim of the Bank.

Class 4: All unsecured claims, other than those in classes 1, 5, and 6.

Class 5: The Bank's deficiency claim.

Class 6: Claim of North Street Limited Partnership secured by its pre-petition second mortgage on the Property.

Class 7: The interests of the Debtor's general and limited partners.

The bankruptcy court summarized the major features of the Plan, relevant to its confirmation decision as follows:

(1) The debtor's partners would contribute a total of $6.125 million in new capital to the debtor over the life of the plan, $3 million on the day after the effective date of the plan, and $625,000 on each of the next five anniversaries of the effective date. The payment of the five annual installments would be secured by a continuing letter of credit in the amount of $1,125,000.

(2) Priority and tax claims would be paid in full, within 30 days of the effective date of the plan, from funds currently on deposit.

(3) The trade creditors would be paid in full, without interest, 180 days after the effective date of the plan. Upon confirmation, the insiders would waive the general unsecured claims that they hold (including, apparently, the claims purchased by the general partner).

(4) The bank's secured claim, fixed at $54,544,500 would be paid partly in cash ($1,149,500 within five days of the effective date of the plan), and partly through an interest bearing note, secured by the bank's lien on the property. Monthly payments would be made on the note, on a thirty-year amortization schedule, and the note would mature in seven years, extendable to ten years at the debtor's option, upon certain conditions. The principal of the note would further be reduced by monthly payments to the bank of the excess cash flow of the property. The note would compensate the bank for its extension of credit in three ways: first, a commitment fee in an amount between $266,975 and $545,000 to be determined by the court; second, fixed "base interest" at a rate 3½ per cent over the rate of U.S. treasury obligations maturing 7 years after the effective date of the plan; and, third, "participation interest" of 50% of the net value of the property, either as realized in a sale, or as appraised at the time of any refinancing.

(5) From the remaining value of the property at the time of sale or refinance, payments would be made in the following order: (a) on the unsecured deficiency claim of the bank, payment in full, without interest; (b) for the new capital contributions, payment in full, with interest at varying rates; (c) on the second mortgage held by the general partner, full payment with 10% simple interest; and (d) to the debtor's partners in proportion to their contribution of new capital.

(6) In the event of any default in making the new capital contributions or in making payments under the note, a deed to the debtor's property, held in escrow by a title company, is to be conveyed to the bank. The plan also has a number of features designed to minimize the possibility of any future bankruptcy filing interfering with the bank's right to obtain this conveyance.

(Bk.Dec. 190 B.R. at 575–76.)

The bankruptcy court acknowledged that this Plan, and indeed, the entire bankruptcy case, was filed by the Debtor primarily to avoid severe tax consequences to the Debtor's partners of a foreclosure sale of the Property. The collective liability of the partners, in the event of foreclosure, is estimated at $20 million.

The general unsecured creditors in the class defined by the Plan voted in favor of the Plan; the only votes against confirmation were those of claims held or purchased by the Bank.

### *Motion to Dismiss the Appeal*

■ The Debtor moves to dismiss as moot the Bank's appeal on the grounds that the Debtor has already implemented the Plan and substantial confirmation (as defined in section 1101(b)) has occurred. It contends that, under the circumstances of this case, it

is no longer possible for the Court to grant meaningful relief to the Bank.

In particular, the Debtor contends that numerous good faith transfers have already occurred that cannot be undone: (1) the investors have acquired equity in the Debtor, which, in turn, has acquired the Property; (2) Rudnick & Wolfe has acquired a leasehold interest in the Property; (3) numerous other payments required under the Plan have been made. Furthermore, the cash advanced by the Debtor's investors, who are not parties to the case, have already been used to make payments under the Plan and cannot be recovered. their interests would thus be adversely affected. Rudnick & Wolfe—whose entering into its lease was contingent on confirmation of the Plan and also not a party to the case—would be adversely affected, because it has already given up the opportunity to move to another building and has also spent considerable sums to redecorate its space and acquire new equipment.

The bank contends, to the contrary, that the Debtor overstates the irreversibility of its implementation of the Plan. The Bank simply seeks to foreclose its mortgage. It contends that the return of payments to the trade debt creditors and the real estate tax payments, as well as several other payments, are not necessary for it to pursue a foreclosure. Furthermore, the Bank is in favor of the Rudnick & Wolfe lease extension and would not disturb any aspect of it. The transactions involving the Bank are at the heart of this appeal and can be easily undone: the Bank will return any payments necessary to insure that it has received no more than it would had the Plan not been confirmed and will return any documents it has received under the Plan. The Bank also agrees to leave any post-petition service contracts undisturbed. Moreover, the Bank is prepared to fund the repayment of any amount advanced by the investors, as well as any ancillary amounts necessary to accomplish this.

The Confirmation Order does not involve complex transactions. We are persuaded by the Bank's arguments that, in the event of reversal, the implementation of the Plan can be undone without undue difficulty and without harm to third parties. We therefore deny the Debtor's motion to dismiss the appeal as moot.

### Appeal of the Confirmation Order

■ On an appeal from the bankruptcy court, the district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." 11 U.S.C.Fed. R.Bankr.Proc. 8013 ("Rule 8013"). The district court shall not set aside the bankruptcy court's findings of fact unless clearly erroneous, *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993), and shall not overturn them so long as they are "plausible in light of the record viewed in its entirety." Rule 8013; *Levinson v. United States,* 969 F.2d 260, 265 (7th Cir.), cert. denied, 506 U.S. 989, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992) (citing *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985)). Meanwhile, the district court reviews the bankruptcy court's conclusions of law *de novo. Meyer v. Rigdon,* 36 F.3d 1375, 1378 (7th Cir.1994); *Woodbridge Place Apartments v. Washington Square Capital, Inc.,* 965 F.2d 1429, 1434 (7th Cir.1992).

The Bank argues on appeal that the bankruptcy court erred in concluding that the Debtor had established that the Plan satisfied the requirements of 11 U.S.C. § 1129;[2]

---

**2.** Section 1129 states, in relevant part:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

. . . .

(5)(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

and that it erred in entering the Confirmation Order based on that conclusion. In arguing that the bankruptcy court did so err, the Bank raises the following issues:

1. Whether the Bankruptcy Court erred as a matter of law or fact in concluding that the Plan was proposed in good faith as required by § 1129(a)(3).

2. Whether the Bankruptcy Court erred as a matter of law or fact in concluding that the continuation of North LaSalle, the Debtor's sole remaining general partner, in control of the Debtor was in the interests of creditors and consistent with public policy as required pursuant to § 1129(a)(5).

3. Whether the Bankruptcy Court erred in concluding that the Debtor had satisfied the impaired accepting class requirement of § 1129(a)(10).

4. Whether the Bankruptcy Court erred as a matter of law or fact in concluding that the Plan did not unfairly discriminate against [the Bank's] unsecured claim in violation of § 1129(b)(1).

5. Whether the Bankruptcy Court erred as a matter of law in concluding that

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.
. . . .
(7) With respect to each impaired class of claims or interests—
(A) each holder of a claim or interest of such class—
(i) has accepted the plan; or
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or
(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.
. . . .
(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.
(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
. . . .
(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(A) With respect to a class of secured claims, the plan provides—
(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
(iii) for the realization by such holders of the indubitable equivalent of such claims.
(B) With respect to a class of unsecured claims—
(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
(C) With respect to a class of interests—
(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

the unsecured or otherwise unsupported promissory notes of the Debtor's partners could be considered for any purpose.

6. Whether the Bankruptcy Court erred as a matter of law in concluding that the "new value" exception to the absolute priority rule continues to exist under the Bankruptcy Code.

7. Whether the Bankruptcy Court otherwise abused its discretion in finding that the Plan satisfies the "new value" exception to the absolute priority rule.

8. Whether the Bankruptcy Court erred as a matter of law or fact in concluding that the Plan was feasible under § 1129(a)(11), notwithstanding that the Bankruptcy found that the Debtor will experience negative cash flow in years seven and eight of the Plan, which the Debtor itself estimates to be at least $5 million.

9. Whether the Bankruptcy Court erred as a matter of law in concluding that the Plan was feasible under § 1129(a)(11) based on the Plan's provisions providing that a deed conveying the Property to the Bank is to be placed in escrow on the effective date of the Plan and delivered and recorded upon the occurrence of an event of default under the Plan.

10. Whether the Bankruptcy Court otherwise abused its discretion in finding that the Plan was feasible under § 1129(a)(11).

11. Whether the Bankruptcy Court erred as a matter of law, or otherwise abused its discretion, in concluding that the Plan provides fair and equitable treatment of the Bank's secured claim because the GECC Letter of Intent—the purported basis of the terms and conditions governing the treatment of the Bank's secured claim under the Plan (including the interest rate)—was a "market" proposal.

12. Whether the Bankruptcy Court otherwise abused its discretion in finding that the Plan provides for fair and equitable treatment of [the Bank's] secured claim.

13. Whether the Bankruptcy Court erred as a matter of law by deducting the hypothetical costs of disposition from the value of the Property to determine the amount of [the Bank's] secured claim.

14. Whether the Bankruptcy Court abused its discretion in finding that the Plan satisfied the "best interests" test under § 1129(a)(7) without its providing for the payment of interest on the Class 4 Claims.

(Appellant's Br. at 4–6.)

It is apparent that the Bank raised all or nearly all of these issues before the bankruptcy court, and in substantially the same form. In a lengthy Memorandum of Decision, the bankruptcy court thoroughly explored all of the Bank's objections. In order to affirm the Confirmation Order, we must uphold the decision of the bankruptcy court on each of these issues. *See, e.g., In re Rusty Jones, Inc.,* 110 B.R. 362, 373 (Bankr. N.D.Ill.1990). We discuss each of the Bank's objections in turn.

## I. *Good Faith Proposal of Plan*

The Bank contends that since the primary purpose of the Plan, as found by the bankruptcy court, was to help the debtor's sophisticated investors avoid adverse income tax consequences that they would experience as a result of the Bank's foreclosure of its mortgage, the Plan violates the requirement of section 1129(a)(3) that the Plan be "proposed in good faith and not by any means forbidden by law."

The standards for "good faith" proposal of a plan are set forth in *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir. 1984). The Seventh Circuit interpreted "good faith" to mean "that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *Id.* (*quoting In re Nite Lite Inns,* 17 B.R. 367, 370 (Bankr.S.D.Cal.1982)). Similarly, the "good faith" requirement "require[s] the bankruptcy court to review the proposed plan for accuracy and 'a fundamental fairness in dealing with one's creditors.'" *Id.* (*quoting In re Rimgale,* 669 F.2d 426, 432–33 (7th Cir.1982)). "Thus, for purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry

is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Id.* The *Madison Hotel* court explicitly distinguished the determination under section 1129(a)(3) of whether a plan is *proposed* in good faith from the determination of whether the Chapter 11 petition for reorganization was *filed* in good faith. *Id.* The court thus held that the district court had erroneously construed section 1129(a)(3) when it evaluated the pre-filing conduct of the debtor as well as the feasibility of the plan itself. Thus, we will not consider the motive of the Debtor or its partners in filing their Chapter 11 petition in determining whether or not its Plan fulfills the good faith requirement for confirmation.

■ Even were good faith in *filing* an issue, the Debtor's motive to avoid adverse consequences would still not constitute bad faith. *In re Cadwell's Corners Partnership,* 174 B.R. 744, 762 (Bankr.N.D.Ill.1994) (holding that concern about tax consequences of foreclosure is alone insufficient to establish bad faith). This result also comports with the holding of *In re James Wilson Associates,* 965 F.2d 160, 170 (7th Cir.1992): "It is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?" This was in response to the argument by the principal creditor that the sole purpose of the entire bankruptcy proceeding was to squirrel away the rents where the receiver couldn't get at them. It is difficult to see how this differs materially from the Bank's argument in this case. The Seventh Circuit opined that the clearest case of bad faith would be "where the debtor enters Chapter 11 knowing that there is no chance to reorganize his business and hoping merely to stave off the evil day when the creditors take control of his business." *Id.* In addition, bad faith filing is found where the debtor is able to pay its creditors in the ordinary course, where there is no prospect for reorganization, and where filing is for purposes of harassment. *In re N.R. Guaranteed Retirement, Inc.,* 112 B.R. 263 (Bankr.N.D.Ill.), *aff'd* 119 B.R. 149 (N.D.Ill.1990).

The Bank's reliance on *In re Love,* 957 F.2d 1350, 1358–59 (7th Cir.1992) for the proposition that a plan motivated primarily to avoid adverse tax consequences is proposed in bad faith is misplaced. *In re Love* involved a Chapter 13 petition filed by a member of a tax protest group who had submitted false W–4 forms, and continued to do so after the Internal Revenue Service ("IRS") instructed his employer not to accept them. He also did not file his federal income tax forms for the years 1981 through 1985 until 1986. As result of these and other activities, as well as refusal to pay assessed income taxes, the IRS initiated levies against the protester. He then filed his Chapter 13 petition, as the court found, to avoid paying assessed taxes, much of which, under the circumstances of the case, did not constitute priority claims. *Id.* Unlike that case, the Debtor does not seek to avoid taxes already incurred, but to structure its transactions so as to avoid incurring tax liability. *See In re Sherwood Square Assocs.,* 107 B.R. 872, 876 (Bankr.D.Md.1989) (holding that a desire to avoid tax consequences by the debtor's partners is not bad faith, in contrast to a situation where the only asset of a debtor is a tax loss).

The Bank's reliance on *In re Castleton Associates Limited Partnership,* 109 B.R. 347 (Bankr.S.D.Ind.1989) is likewise unavailing. In *Castleton,* the question was whether a Chapter 11 petition was *filed* in good faith pursuant to section 1112(b). Furthermore, the debtor was a partnership whose sole asset was a residential apartment complex that was unable to generate enough income to meet operating expenses. The debtor did not even operate the business, but contracted out to a management company the everyday duties of maintaining and managing the complex. Thus, unlike this case, the debtor really had no business of its own to preserve—merely an investment. *Id.* at 350.

The Bank further argues that the bankruptcy court's factual findings that the Plan was proposed in good faith is clearly erroneous because "[i]t is undisputed that the entire risk of the Plan on creditors falls on" the Bank. It points to the provisions for prompt payment of the full amount of principal to all other non-insider creditors, to the cash flow shortages in years seven and eight, and as-

serts that the insider creditors—to the extent that they have any claims—do not expect to receive, and are unlikely to receive, any distribution on their claims and that the Debtor's investors stand to receive no economic benefit from the Property. It argues that the Debtor's partners could have contributed a greater amount of new capital and that the feasibility of the Plan depends entirely on the Bank's willingness to relend excess cash flow payments in years seven and eight. In sum, the Bank contends that the full risk of the Plan is placed on it, not to maximize the value of the estate for creditors, but to allow the Debtor's investors to avoid adverse tax consequences.

Many of the Bank's assertions are raised in other of it's objections and will be addressed more specifically as we discuss each of them below. We will then return to the general fairness issue. The Bank cites no law concerning how risk is to be distributed among *creditors*. Suffice it to say that the Debtor's investors also take on considerable risk through their $3 million cash investment, their execution of notes obliging them to make annual payments of $625,000, their purchase of a letter of credit, and their granting of additional security interests to the Bank in the form of a commitment fee, an initial $1.149 million payment, and to fund the cost of Rudnick & Wolfe's lease extension. Furthermore, the bankruptcy court found that the Bank's risk is considerably less than it seems to argue. The cash shortfall in years seven and eight arise from projected costs in extending the lease of Coopers & Lybrand and will result in an enhanced value to the Property—and the Bank has a right to disapprove lease transactions and not to relend excess cash flow payments. Moreover, the Bank is entitled to automatic transfer of the title of the Property in the event of a default. The Bank's own appraiser testified to the improving market for buildings like the Property; thus, the Bank will enjoy a comfortable equity cushion—as a result both of the increase in equity and the paying down of the principal on its secured claim.

We conclude that the bankruptcy court's factual finding that the Plan was proposed in good faith is amply supported and is not clearly erroneous.

## II. *Continuation of Debtor's Present Management*

Section 1129(a)(5)(A)(ii) requires that the continuation of the Debtor's present management under a plan be "consistent with the interests of creditors and equity security holders and with public policy." The Bank contends that the continuation of the Debtor's management is not in the interests of creditors and public policy because, before filing the petition, these managers failed to use pre-petition rents for timely payment of real estate taxes. The Bank further contends that this failure was motivated solely by a desire to improve the Debtor's bargaining leverage vis-a-vis the Bank. The Bank argues that because nonpayment of real estate taxes constitutes waste under Illinois law, the Debtor's willingness to engage in nonpayment makes continuation of management contrary to the interests of creditors.

The cases relied upon by the Bank do not support its contentions as they apply to this case. In particular, nonpayment of real estate taxes *may* constitute waste if such nonpayment harms the creditors. *Hausmann v. Hausmann*, 231 Ill.App.3d 361, 172 Ill.Dec. 937, 941, 596 N.E.2d 216, 220 (1992). Courts have found that nonpayment of taxes constitute waste where such nonpayment is continuous and resulted in repayment of such taxes by the principal creditor after foreclosure or a tax sale of the property in question. *Hausmann, supra; North Am. Security Life Ins. Co. v. Harris Trust & Sav. Bank*, 859 F.Supp. 1163 (N.D.Ill.1994); *Capitol Bankers Life Ins. Co. v. Amalgamated Trust & Sav. Bank*, No. 92 C 4480, 1993 WL 594103 (N.D.Ill. May 6, 1993), *aff'd*, 16 F.3d 1225 (7th Cir.1994). In this case, there was no continuous practice of nonpayment of real estate taxes, but rather a single transfer of rental income into an account that remained in the control of the Debtor. The bankruptcy court found that this transfer was an error in judgment—it exposed the Debtor unnecessarily to tax penalties and was unlikely to achieve its intended purpose of advancing

settlement discussions with the Bank—but that it is not indicative of a general course of conduct prejudicial to creditors. The Bank points to no facts that would indicate that this finding is clearly erroneous, and we therefore accept it. In fact, the single delinquent installment of real estate taxes has been paid pursuant to section 3.2 of the Plan. Moreover, the difference between the monthly penalties that accrued on the unpaid taxes and the earnings on the Debtor's cash were paid by the Debtor's management company. Thus, neither the Bank nor the Property were injured in any way by the delay in payment.

### III. *Artificial Impairment*

■ Section 1129(a)(10) requires that, if any class of claims are impaired under a plan, at least one of those classes must accept the plan, without including any acceptance of the plan by any insider. Since the Bank did not accept the Plan, the only non-insider class remaining is the class of trade debt claims, which did accept the Plan. The Bank contends that the acceptance of the Plan by this class should be disregarded, because there was no valid reason to impair those claims—they total only $90,000, and the Debtor had more than enough resources to pay them in full, with interest, on the effective date of the Plan.

The Bank relies on *In re Windsor on the River Associates,* 7 F.3d 127 (8th Cir.1993). In *Windsor,* the debtor, whose sole asset was a 298–unit apartment complex, proposed a plan that impaired a class of trade creditors by providing for the payment of those claims 60 days after the effective date of the plan. The Eighth Circuit refused to recognize this impairment, holding that "for purposes of 11 U.S.C. 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion." *Id.* at 132. The court found that an "arbitrary manipulation" had taken place, "the only purpose" of which was "to ensure approval by at least one 'impaired' class as required by section 1129(a)(10)." *Id.* at 133.

The bankruptcy court read *Windsor* as "requir[ing] the denial of confirmation in any case where it would be possible to structure

a plan without an approving impaired class" (Bk.Dec. 190 B.R. at 592–93.), then discussed the rejection of this rule by the Ninth Circuit Bankruptcy Appellate Panel as unsupported by the language of the Code and as inconsistent with the Code's policy of flexibility in plan formulation. *See In re Hotel Assocs. of Tucson,* 165 B.R. 470, 475 (9th Cir. BAP 1994); *accord, In re Beare Co.,* 177 B.R. 886 (Bankr.W.D.Tenn.1994). Other courts have confirmed plans over objections of artificial impairment because the debtor showed that the impairment, although not absolutely essential, was desirable for other purposes and not solely to achieve impairment. *In re Duval Manor Assocs.,* 191 B.R. 622 (Bankr. E.D.Pa.1996); *In re Rivers End Apartments, Ltd.,* 167 B.R. 470, 479 (Bankr.S.D.Ohio 1994). Indeed, in a wide-ranging discussion, the court in *Duval Manor* indicated that the issue of allowing artificially impaired classes under section 1129(a)(10) was a "cutting-edge" issue in bankruptcy today and that courts could be found on both sides of the issue. *Duval Manor, supra,* at 626–29. The court concluded that restricting artificial impairment could itself give rise to a "Pandora's box" of related problems. *Id.* at 629. *See also* Eric W. Lam, *On the River of Artificial and Arbitrary Impairment: An Erroneous Analysis,* 70 N.D.L.Rev. 993 (1994).

The bankruptcy court found that the trade claims were not impaired solely for the purposes of insuring compliance with section 1129(a)(10). The operating income is not projected to provide sufficient income to pay all unsecured claims in full, with interest. Thus, the debtor had to impair claims. The court found that the Plan's manner of doing so is highly favorable to non-insider claims by providing for payment of the principal of those claims before payment of any insider claims. Though the Debtor could have structured the Plan to provide payment of the trade debt claims in full with interest, doing so would have reduced the amount available to satisfy other claims, including those of the Bank, and would have made confirmation more difficult. (See our discussion of the Bank's fourth objection, *infra,* in regard to treatment of trade debt claims.) This is in

marked contrast to the situation in *Windsor,* where the only impairment is a sixty-day delay in payment—thus, no other class could have been affected in any way by the choice to impair. We think, in fact, that the bankruptcy court read *Windsor*'s holding too broadly—it does not require the denial of confirmation in any case where it would be possible to structure a plan without an approving impaired class. The *Windsor* court made clear that the only purpose to be served by the proposed impairment before it was to insure an impaired class—it noted that the "[d]ebtor never presented a plausible alternative explanation." *Windsor, supra,* at 133. Given the unsettled nature of the law on this issue—the Seventh Circuit has not spoken—we conclude that the bankruptcy court did not err as a matter of law in finding that the Plan complies with section 1129(a)(10). Furthermore, "[w]hether Debt-. or manipulated the terms of its plan for purposes of securing confirmation is a question of fact." *Id.* at 132. We conclude that the bankruptcy court's finding that the trade debt class was legitimately impaired is not clearly erroneous.

## IV. *Unfair Discrimination Against the Bank's Unsecured Deficiency Claim*

The Bank contends that the Plan violates section 1129(b)(1), which requires that a plan "not discriminate unfairly ... with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." In particular, the Bank contends that since its unsecured deficiency claim is not to receive any distribution until the sale or refinancing of the Property—which is not expected for seven or ten years and even then, the court found, the present value of the Bank's distribution does not exceed 16% of the Bank's claim—while the other unsecured non-insider creditors are to receive 100% of the principal amount of their claims on the effective date of the Plan, its

deficiency claim is discriminated against unfairly.

At the outset, we note that the Seventh Circuit has interpreted sections 1111(b) [3] and 1122(a) [4] to require that the unsecured deficiency claim of a secured creditor, where the debtor's sole asset is fully encumbered, be classified separately from the general unsecured creditors, because the legal rights of such a claimant are different from those of a general unsecured claimant. *In re Woodbrook Assocs.,* 19 F.3d 312, 319 (7th Cir. 1994). Clearly some discrimination between these classes must be permissible. *In re Aztec Co.,* 107 B.R. 585, 588–89 (Bankr. M.D.Tenn.1989). The critical question then is not whether there is discrimination, but whether such discrimination is unfair.

The Bank relies on *Woodbrook* and *Aztec.* In *Woodbrook,* a provision providing for a 5% distribution to an section 1111(b) unsecured deficiency claim while providing for payment in full to the other unsecured claimants was found to discriminate unfairly. However, as the bankruptcy court noted, the *Woodbrook* court also found that the other unsecured creditors were in fact insiders and it did not discuss its general understanding of unfair discrimination. The bankruptcy court concluded that it is possible to lay a framework for measuring the fairness of a discrimination in Chapter 11 plans in two steps. First, any discrimination must be supported by a legally acceptable rationale, and, secondly, the extent of the discrimination must be necessary in light of that rationale. In this view, the discrimination in *Woodbrook* is unfair because favoring insiders at the expense of the deficiency claim, at least at the extreme disproportionality contemplated in that plan, could not be justified. In this case, the bankruptcy court concluded that the Debtor had provided a compelling rationale for its disparate treatment of unsecured claims: the best interests test as set forth in section 1129(a)(7), which requires that the debtor pay holders of impaired claims as much as

---

**3.** Section 1111(b) creates an unsecured deficiency claim of an undersecured creditor for the amount that the total lien exceeds the value of the collateral. Such a creditor may waive its deficiency claim and elect to have its claim treated as secured for the entire amount of the debt.

**4.** Section 1122(a) provides that

a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

they would have received in a Chapter 7 liquidation. The trade creditors in this case would have been paid in full under Chapter 7, while the Bank's unsecured deficiency claim would receive nothing. Thus, in order to be confirmed, the Plan must provide for full payment of the trade debt. Since the Debtor cannot then pay all of its creditors in full, at least some must be paid less than their full claim—as long as they receive at least as much as they would have received under Chapter 7. The bankruptcy court next found that the discrimination in the Plan is narrowly tailored to meet the requirements of the "best interests" test: the trade creditors receive only the principal amount of their claims and all insider claims are either waived or subordinated to the Bank's deficiency claim. The bankruptcy court concluded that this treatment is not unfair.

The Bank asserts that *Aztec* controls in this case, in its rejection of the proposition that the requirements of the "best interests" test provide a rational basis, in and of themselves, for discriminating against a deficiency claim that arises solely by virtue of section 1111(b). It further asserts that the Seventh Circuit itself relied on this holding in its reliance on *Aztec* in *Woodbrook*. The Bank both misreads *Woodbrook* and misapplies *Aztec* to this case. *Aztec* is cited in *Woodbrook* in support of the holding of the latter that a Plan that discriminates by providing *de minimis* treatment to a deficiency claim while providing substantially more favorable treatment to insider claims, discriminates unfairly and cannot be confirmed. More importantly, the *Aztec* court found an additional basis for finding the discrimination to be unfair where the *de minimis* treatment of the deficiency claim—in relation to insider claims—was *justified* on the basis that the deficiency claim would receive no more under a chapter 7 liquidation. In contrast, the Bank's deficiency claim does receive more favorable treatment than it would in a chapter 7 liquidation, and its failure to receive even better treatment is not at the expense of insider claims, but because the trade debt claims *must* be treated at the level they are in order to satisfy the "best interests" test. We conclude that the bankruptcy court properly found that the Plan does not unfairly discriminate against the Bank's unsecured deficiency claim.

## V. *Unsecured Promissory Notes*

Under the Plan, the Debtor's equity holders are to contribute $6.125 million in new capital in the form of $3.0 million in cash the day after the effective date of the Plan and $625,000 annually for five years. The five annual installments are secured by a continuing letter of credit in the amount of $1,250,000. The Bank contends that this constitutes only $4.1 million of new value in the form of money or money's worth, because the remaining $1,875,000 is not covered by the letter of credit and is therefore in the form of unsecured promissory notes. The Bank contends that the bankruptcy court erred when it considered the value of these unsecured promissory notes in determining that the interest rate to be paid on the Bank's secured claim in determining that the Plan is feasible.

The bankruptcy court found that although the notes are unsecured, there is "de facto" recourse: the partners will suffer a $20 million tax liability if the property is sold in a foreclosure sale and thus have a substantial incentive to meet their obligations under the notes, and the letter of credit securing payment of their contributions is not fully released until all five of the annual payments are made. These factors provide sufficient assurance that the payments will be made.

The Bank relies on several cases in support of its contention that unsecured promises to make future payments do not constitute money or money's worth. *See In re Snyder*, 967 F.2d 1126, 1131 (7th Cir.1992); *In re 8315 Fourth Avenue Corp.*, 172 B.R. 725, 737 (Bankr.E.D.N.Y.1994); *In re Yasparro*, 100 B.R. 91 (Bankr.M.D.Fla.1989). These cases, however, all discuss whether unsecured promissory notes can be considered in assessing the substantiality of a proposed contribution of new value for purposes of the new value exception to the absolute priority rule, which we discuss below, and not whether they can be considered for any other purpose—including determinations of feasibility or of interest rates to be paid on se-

cured claims, as here. The Bank has not cited any cases supporting its assertion that promissory notes may not be considered in these contexts. The bankruptcy court specifically did not consider the promissory notes covering the last three annual payments in determining that the infusion of new capital is sufficient. We conclude that the court did not err as a matter of law in considering the unsecured promissory notes in determining the interest rate to be paid on the Bank's secured claim and that its factual finding that the circumstances surrounding the issuance of the unsecured promissory notes are sufficient to insure payment is not clearly erroneous.

## VI. *The "New Value" Exception to the Absolute Priority Rule*

Section 1129(b)(2)(B) sets forth the minimum standards that a plan must meet to satisfy the "fair and equitable" requirement. This test, known as the "absolute priority rule," requires that unless each claim in a non-accepting class of unsecured claims is paid in full on the effective date of the plan, the plan must provide that "the holder of any claim or interest that is junior to such class will not receive or retain under the plan on account of such junior claim or interest in any property." 11 U.S.C. § 1129(b)(2)(B).

The Bank contends that the Plan violates this requirement, because, although its deficiency claim will not receive full payment, the holders of partnership interests in the Debtor—which of course are junior to the Bank's deficiency claim—do receive property in the form of equity. The bankruptcy court found that this equity retained by the debtor's partners is on account of the new capital that they are to contribute under the Plan, and that this retention of ownership interest is permissible under a "new value" exception to the absolute priority rule.

The Bank, while conceding that the existence of the "new value" exception is an open issue in the Seventh Circuit, argues that the most persuasively reasoned Seventh Circuit discussion of the issue indicates that the court, in an appropriate case, would not recognize the exception. The Bank relies principally on *Kham & Nate's Shoes No. 2 v.*

*First Bank*, 908 F.2d 1351, 1360–62 (7th Cir. 1990), which declined to reach the question of a new value exception because the proposed contribution by the debtor would have been insufficient in any case. The *Kham* court, nevertheless, indicated that it thought the new value exception was unlikely to survive, because the language of the Code strongly suggests that such an exception does not exist and because Congress was not receptive to a proposal by the Bankruptcy Commission to codify the exception when it recodified the bankruptcy Code in 1978. *Id.* at 1361–62.

On the other hand, the court, in *In re Snyder*, 967 F.2d 1126, 1128–31 (7th Cir. 1992), while again declining to rule on the question because of an inadequate proposed contribution, looked favorably upon the existence of the new value exception. It pointed to a strong history of the exception in judicial decisions that Congress did not clearly overrule, as well as strong policy arguments for its retention, noting in particular situations where owner participation in a reorganized entity would be particularly valuable in its operation, or where the necessary new capital would be otherwise unavailable. Furthermore, the *Snyder* court cited with approval several commentators who reasoned that the new value exception is better seen as a "corollary" to the absolute priority rule rather than an "exception" to it. In particular, the rule bars old equity from retaining or receiving an interest "on account of" its prior ownership. But when necessary new capital is provided, the source of the retained interest is not the prior equity interest, but rather the new contribution. Thus, such a "corollary," not being an exception, survived the 1978 re-enactment of the Code. *Id.* at 1130.

More recently, the Ninth Circuit, after a long and detailed examination, held that the new value exception is valid. *In re Bonner Mall Partnership*, 2 F.3d 899, 905–17 (9th Cir.1993). The bankruptcy court found the arguments advanced in *Bonner Mall* to be persuasive. It summarized them as follows:

(1) the language of Section 1129(b)(2)(B) cannot unambiguously be applied in the context of a contribution of new value by the debtor's owners; (2) given this genuine

ambiguity, it is appropriate to look at pre-Code practice for aid in interpretation; (3) prior to the adoption of the Code ... the availability of the "new value" approach to reorganization was generally recognized; (4) nothing in the legislative history of the Code, or the language of the Code itself, gives any clear indication that Congress intended to eliminate the new value approach.

(Bk.Dec. 190 B.R. at 587.) Furthermore, the Ninth Circuit found that the new value exception is consistent with the underlying policies of Chapter 11 of the Code. *Bonner Mall, supra*, at 915–17. In particular, permitting debtors to contribute new capital, which may be otherwise unavailable, increases the amount available to use in reorganization and in paying creditors; it often allows control and management to remain with the old owners, who are often in the best position to re-establish a profitable business. Furthermore, it enhances the primary purposes of chapter 11 of successful debtor reorganization and maximization of the value of the estate (*see NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 1196–97, 79 L.Ed.2d 482 (1984)). *Id.* at 915–16.

The most recent Seventh Circuit case on the subject, while again declining to rule, looks favorably upon its continued vitality. *In re Wabash Valley Power Ass'n,* 72 F.3d 1305, 1314–15 (7th Cir.1995). The court's observation that the "common thread running through cases involving the absolute priority rule is a refusal to allow prior equity owners to trade on their 'insider' status to acquire new equity for less than its value." *Id.* at 1315. The *Bonner Mall* court, likewise, found this to be a concern and concluded that a properly applied new value exception was the best way to avoid such "insider" deals, or collusion, which are not strictly prohibited by the language of the Code. *Bonner Mall, supra,* at 916. This suggests that the "new value exception," rather than being a ministerially applied judicial appendage to the Code, is best seen as an opportunity for the bankruptcy court, in its discretion, to make use of an opportunity for new capital contributions by the debtor in fashioning a workable and equitable plan of reorganization.

In this case, the new value contributions do not result in equity holdings by the Debtor's partners that are of greater value than the contributions, the contributions do add value to the estate, and they do enhance the ability of creditors to realize their claims. Furthermore, the new capital contributions were necessary to the formulation of a successful Plan. We conclude that the bankruptcy court properly found that a new value exception does exist, and that it properly applied the exception in confirming the Plan.

## VII. *Substantiality of New Capital*

The Bank argues that even if the "new value" exception continues to exist, the new capital contribution under the Plan is insufficient to satisfy the exception. The new capital contribution—$3.0 million in cash and a letter of credit posted in the face amount of $1.25 million—was determined by the bankruptcy court to have a present value of $4.1 million. This amount equals 7.5% of the Bank's secured claim and 7% of the total unsecured claims. The Bank first contends that, when considered merely as a percentage of senior claims, the new capital contribution is not substantial. *See Woodbrook, supra* at 320 (holding that a 3.8% contribution is not substantial); *Snyder, supra* at 1131 (holding that a contribution equal to 2.7% of total unsecured debt or 3.3% of the claim of a single unsecured creditor is not substantial).

The bankruptcy court responded to this argument by pointing out that the total unsecured claims are not relevant here, because many of those claims belong to the general partner or an entity that it controls and have been either waived or subordinated to the claims of the bank. Furthermore, the non-insider trade debt is paid in full under the Plan. Thus, the only unsecured claim that is being involuntarily primed by the new capital is the Bank's deficiency claim. The new value contribution equals about 10.7% of that claim. More importantly, the *Snyder* court itself stated that

We cannot say that the determination as to whether an infusion of new capital is "substantial" will always hinge on a comparison

to the total amount of unsecured debt. There is no mathematical formula for resolving the substantiality issue, and it will depend on the circumstances of the individual case.

*Id.* at 1131–32. The bankruptcy court concluded that, in this case, the new capital contribution is substantial both in absolute terms and in its impact on this case:

> The $4.1 million minimum value of the contribution in this case dwarfs the $30,000 involved in *Snyder* and the $100,000 in *Woodbrook.* It constitutes over 20% of the tax liability the partners hope to avoid. And, most significantly, the total contribution package, however valued, is substantial enough to make possible a commercial loan on the debtor's property consistent with the terms of the proposed plan. That plan, in turn, offers a substantial (16%) return on the bank's deficiency claim. The new value contributions proposed by the September 11 plan are not mere tokens, but genuine contributions to the proposed plan.

(Bk.Dec. 190 B.R. at 588–89.)

The Bank contends, however, that the true measure of the substantiality of new capital contribution is whether it makes a plan feasible. *See, e.g., Woodbrook, supra,* at 320; *Snyder, supra,* at 1131 ("The substantiality requirement" means "that an infusion of new capital must be necessary to the success of the undertaking."). It then contends that the proposed new capital contribution in this case is insufficient to render the Plan feasible, because it does not sufficiently counter the projected net cash flow shortfalls in years 2002 and 2003. On the contrary, the bankruptcy court was well aware of the shortfalls in years 2002 and 2003 and of the various devices in the Plan that make the success of the Plan very likely. *See* our discussion of the Discretionary Cash Flow Readvance, *infra.* The determination of whether new capital contributions are sufficient to satisfy the exception to the absolute priority rule is a factual one, depending on all the circumstances of the case. *See Woodbrook, supra,* at 320; *Snyder, supra,* at 1131. The bankruptcy court has thoroughly considered the circumstances of this case in determining that the new capital contribution is sufficient. We conclude that its finding is not clearly erroneous.

## VIII. *Discretionary Cash Flow Readvance*

The bankruptcy court found that, due to anticipated expenses in connection with the renewal of the lease of the Debtor's largest tenant, the projected cash flow in year seven would not be sufficient to make the required debt service, and that this situation continues in year eight, though to a much smaller extent. In the ninth and tenth years, projected cash flow would once again substantially exceed the amount needed for debt service. This cash flow shortfall would be funded by the Debtor's request that the Bank relend the necessary moneys from the amounts it will have received during years one through six in the form of excess amortization payments, i.e., payments to the Bank from excess cash flow over and above the regular monthly amortization payments. The Bank contends that because this readvance feature is wholly discretionary with the Bank, the necessity of this readvance renders the Plan infeasible.

The bankruptcy court concluded that the Debtor's inability to force a loan from the bank does not imply failure of the Plan. Rather, the court found that it likely that the Bank would make the loan willingly, because

> [t]he bank would have enjoyed six years of successful operation of the property, and would, at the time of the request for relending, have a debtor with stable income prospects and a defined short term cash flow shortage. Not only would the bank be given a generous return on the short term lending, the ultimate effect of the lending would be to increase the debtor's equity in the property, which equity would inure completely to the bank through participation interest and payment of its unsecured deficiency claim.
>
> Alternatively, the debtor would have the option of selling the property and prepaying the loan without penalty. The experts of each party testified to an improving market for office buildings in the Chicago central business district.

Finally, if the anticipated cash shortfall in the seventh year of the plan cannot be made up by the debtor, there will still be no 'liquidation, or the need for further financial reorganization of the debtor.' The debtor's plan itself provides for a consensual transfer of the property to the bank in the event of default, and, this feature of the plan is likely to be enforced in any subsequent bankruptcy proceeding.

(Bk.Dec. 190 B.R. at 594–95.)

The Bank contends that the bankruptcy court's finding that the Bank would make the loan willingly is clearly erroneous because it overlooked several material circumstances that the Bank contends are more likely to be relevant at that time: (1) the Rudnick & Wolfe lease extension will have only several years remaining, and thus the property will face a significant tenant rollover risk; (2) the court's prediction as to the future real estate market in general and as to the Property in particular may prove incorrect, and (3) the Debtor's past history of intentional failure to pay real estate taxes is indicative of possible future behavior prior to impending maturity of the loan extension.

The feasibility requirement of section 1129(a)(11) is that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Thus, the "standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). Furthermore,

[a] plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable. The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. The mere potential for failure of the plan is insufficient to disprove feasibility.

*In re Patrician St. Joseph Partners Ltd. Partnership*, 169 B.R. 669, 674 (D.Ariz.1994) (citations omitted). The bankruptcy court relied on these standards in concluding that the debtor had established the feasibility of the Plan.

The Bank's objections, while reasonable, are primarily hypothetical, and constitute merely disagreements with the inferences drawn by the bankruptcy court. Furthermore, by the seventh year, the principal balance of the Bank's secured loan will have fallen to about $41.5 million, while the value of the Property is projected to have increased to considerably more than the present $55.8 million. This would permit a sale or refinancing for an amount more than enough to pay the Bank's secured claim in full. The Debtor also points out that, (1) even in the cash flow shortfall years, net operating income will still exceed debt service on the Bank's secured loan, making default a remote possibility; (2) even in the event of a default, the Bank would automatically obtain title to the Property; (3) the Bank's apparent indisposition to make future readvances ignores the acknowledgements of its own counsel that the Bank would be subject to the duty of good faith in considering the requests; and (4) the Rudnick & Wolfe lease does not expire until 2007, five years after the cash flow shortfall years, greatly minimizing the fears of a rollover risk in 2002.

We conclude that, though there might be room for a difference of opinion, the bankruptcy court's finding that the discretionary nature of the relending feature of the Plan does not render the Plan infeasible is not clearly erroneous.

## IX. *Property Conveyance Features*

The Bank contends that the bankruptcy court erred when it concluded that the Plan's provision for a consensual conveyance of the Property to the Bank in the event of a default negates any feasibility concerns because of the possibility of a Chapter 11 case being filed before the Debtor goes into a default. Though this might not normally be a negligible concern, it is greatly minimized in this case, because, as set forth in section 5.3(b) of the Plan, Mark W. Wilkow, one of the Debtor's principals, covenants to pay the Bank $10 million personally if he causes the Debtor to file a voluntary bankruptcy peti-

tion that blocks the transfer of the Property to the Bank.

The Bank also expresses doubt as to the enforceability of such a conveyance provision. It cites no cases indicating that such a provision might not be enforceable. On the contrary, at least one such conveyance provision has been upheld on appeal. *In re Billy Ray Eubanks,* No. CIV A 89–3426, 1990 WL 128208 (E.D.La. Aug. 28, 1990) (holding that a plan that provides for the transfer of the debtor's assets to a court-appointed receiver for liquidation and distribution of assets in the event of default makes the plan feasible for the purposes of section 1129(a)(11)). We conclude that the bankruptcy court's finding that the property conveyance features of the Plan make the Plan feasible is not clearly erroneous.

### X. *Concrete Plan for Sale*

■  The Bank contends that in the absence of a concrete proposal for a sale or refinancing of the Property during the term of the Plan, the bankruptcy court abused its discretion in finding that the Debtor would be able to sell or refinance in either year seven or ten, in order to pay the Bank's claim. The only support for this contention cited by the Bank is *In re 8th Street Village Limited Partnership,* 88 B.R. 853, 858 (Bankr.N.D.Ill.1988). In that case, the debtor, which owned as its sole asset a shopping mall in Boise, Idaho, proposed a plan that included the sale or refinance of the mall in nine years. The court found that without a concrete plan for such sale or refinance, the plan was not feasible. However, the circumstances in that case differed significantly from the instant case. The operations of the mall were unable to generate sufficient income to service current debt, and there were no realistic prospects of a turnaround. In addition, the principal office tenant was about to vacate. The debtor's plans for improvement of its operations were found by the court to be speculative, and the testimony of its expert witness as to an improving market was not found credible. In short, the court concluded that increased competition would most likely make the debtor's projection of a turnaround little more than "hopes and

dreams." In those circumstances, the court reasonably concluded that concrete proposals for a sale or refinance of the mall would be required for confirmation of the plan. *Id.*

In the instant case, to the contrary, the income from the Property is sufficient to service current debt, with the exception of the cash flow shortfall in years seven and eight—already adequately dealt with; the vacancy rate is extremely low and is not expected to be a serious concern; and credible expert testimony on both sides supports an improving market for buildings such as the Property. In these circumstances, we conclude that the bankruptcy court properly found that the intention to sell or refinance the Property in seven or ten years, even without a concrete current proposal, is sufficient to make the Plan feasible.

### XI. *GECC Letter of Intent*

■  Once the amount of the Bank's secured claim was fixed, it was necessary that the Bank be compensated for not receiving the full amount of its claim on the effective date of the plan by receiving a market rate of interest on its claim. Section 1129(b)(2)(A); *In re James Wilson Assocs.,* 965 F.2d 160, 172 (7th Cir.1992); *In re Bryson Properties, XVIII,* 961 F.2d 496, 500–01 (4th Cir.1992). The bankruptcy court found that an appropriate market rate of return must be at least the discount rate. (Bk.Dec. 190 B.R. at 578–81.) In determining whether the Plan provided for a market rate of return, the court noted that the compensation offered to the Bank is not a flat interest rate. Instead, it consists of three elements: a loan origination fee of between $266,975 and $545,000; fixed base interest at 3.5% over the rate earned by treasury obligations maturing seven years from the effective date of the Plan; and a 50% participation in the net proceeds of any sale or refinancing. These allow the Bank a total rate of return on its secured claim of about 12%. (Bk.Dec. 190 B.R. at 581–82.)

The bankruptcy court found convincing evidence presented by the Debtor that this transaction is acceptable in the market. Robert Walter, a regional vice-president of General Electric Capital Corporation ("GECC") prepared a letter of intent outlin-

ing the terms under which GECC would consider financing the Property.[5] With one exception, the terms of the letter of intent are the same, or more favorable to the Debtor, than the terms of the new note proposed in the Plan.[6] The bankruptcy court accepted Walter's testimony and concluded that the Plan does provide a market rate of return to the Bank on its secured claim.

The Bank offers five reasons why the GECC letter of intent should not be accepted as adequate evidence of a market rate of return: (1) the letter of intent was not a binding commitment, though Mr. Walter testified that he thought that it would receive senior management approval; it had not yet gone through the review process; (2) GECC had not made other comparable loans in the Chicago central business district; (3) GECC is not a dominant player in the real estate debt market; (4) certain of the Debtor's affiliates have enjoyed a previous association with GECC on the strength of four prior and one pending transaction; and (5) other players in the market are looking for 15–25% returns.

The bankruptcy court found, to the contrary, that GECC is indeed a major lender to single asset real estate projects and has expertise bearing precisely on issues relevant to a market rate of return on the note proposed in the Plan. Furthermore, the court found that the rates of 15–25% rates of return sought by the players referred to by the Bank's expert were on properties subject to much greater cash flow risk than is the Property. Though the court did not specifically address the remaining objections in its decision, it was well aware of them and nevertheless found, after considering testimony from experts for both sides, that the Plan provides a market rate of interest to the Bank on its

secured claim. We conclude that this finding is not clearly erroneous.

## XII. *Deferred Participation Interest*

The Bank contends that its being made to wait until after the Property is sold or refinanced to receive its participation interest constitutes negative amortization. It asserts, without elaboration, that such treatment is impermissible under the circumstances. The Bank provides no reasons why such treatment is impermissible other than citation to a case, *In re 641 Assocs., Ltd.*, 140 B.R. 619, 630 (Bankr.E.D.Pa.1992), which merely noted that use of negative amortization had been permitted in rather few instances. On the contrary, the bankruptcy court found that the participation interest feature in the Plan does not constitute negative amortization, accepting testimony to that effect by Mr. Walter, who had included a similar feature in the GECC letter of intent. We conclude that the bankruptcy court's finding is not clearly erroneous, particularly in view of the Bank's failure to provide any reasoning why such a finding should be considered incorrect.

## XIII. *Deduction of Disposition Costs*

Since the bank did not elect, pursuant to section 1111(b), to have its total claim treated as secured, its claim must be bifurcated under section 506(a). Thus, the Bank's secured claim is equal to the value of its interest in the collateral. In determining the value of the Bank's collateral, the bankruptcy court reduced the gross reversionary value by the costs the Bank would incur in converting its interest to cash. The Bank does not object to the amount of such disposition costs as found by the court, but asserts that as a matter of law, it is improper to consider such

---

5. The Debtor did not pursue a commitment from GECC, because the Bank indicated it would not accept a cash payment of its secured claim in the amount found by the bankruptcy court, and furthermore, if the Debtor had proposed such a cash out, the Bank would have had the option of having its entire claim treated as secured under § 1111(b).

6. The one exception is that the GECC letter of intent calls for a flat 1% loan origination fee— $533,950, while the Plan calls for a fee of $266,-

975, or such greater amount as the court may determine up to 1% of the Bank's secured claim—$545,000. The reason for the smaller fee in the Plan is that the Bank, as a current lender to the Property, would not need to engage in such an extensive due diligence as GECC would. Moreover, even with the reduced origination fee, the Plan still provides a greater overall return to the Bank than the GECC letter of intent would provide to GECC.

costs in determining the value of the property.

The relevant statutory language is:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property. . . .

Section 506(a). The bankruptcy court noted that courts initially relied primarily on the first sentence of section 506(a) and held that disposition costs should routinely be deducted in arriving at a value for secured property because the creditor would ordinarily obtain the value of its interest only after a wholesale transaction or foreclosure sale. (Bk.Dec. 190 B.R. at 577.) Later courts, however, placed more emphasis on the second sentence, and held that valuation depends on the debtor's plans for use or disposition of the collateral. Thus, unless the debtor plans to liquidate the collateral, it should be valued at its retail, or replacement, value rather than its wholesale or foreclosure value. *See, e.g., In re Rash,* 62 F.3d 685, 685–687 (5th Cir.1995), *reh'g en banc granted,* 68 F.3d 113 (1995); *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72 (1st Cir.1995); *In re Trimble,* 50 F.3d 530 (8th Cir.1995). As a matter of fact, these three cases cited in support of the Bank's position did not consider the issue of disposition costs as such, but were concerned with whether retail or wholesale value is the proper measure, the difference between which involves much more than merely disposition costs. Only *Trimble* mentions "costs of sale" explicitly. *Trimble, supra* at 531.

The bankruptcy court was not persuaded that the view espoused by these cases is the best reading of section 506(a). It followed the view of the dissent in *Rash,* which argued that in order to give effect to all the statutory language, the value of the secured claim should be measured—as required by the first sentence of section 506(a)—by the extent of the "creditor's interest" in the collateral. Unless the creditor can use the collateral in an ongoing concern, its interest is measured by what it can realize when reducing the property to cash. In this case, the creditor is a bank—it would not operate the Property as an owner. Indeed, the Bank has already stated its firm intention to foreclose. As the bankruptcy court realized, there is no reason to suppose the bank would not be able to sell the property for its fair market value. Thus it is entitled to retail value, as required by *Rash, Trimble,* and *Winthrop, supra,* rather than wholesale or forced foreclosure value. However, in order to realize the fair market value, the Bank would incur disposition costs, and the court took those into account in valuing the property.

Because the decision in *Rash* is currently scheduled for *en banc* rehearing, and because the reasoning of both *Trimble* and *Winthrop* have been rejected by more recent bankruptcy decisions, *see In re Madison,* 186 B.R. 182 (Bankr.E.D.Pa.1995) (valuing collateral to be retained and used by debtor at average of wholesale and retail value); *In re Hoskins,* 183 B.R. 166 (Bankr.S.D.Ind.1995) (same), the issue of how to value collateral retained by a debtor is clearly not settled. Our review of the relevant cases leads us to agree with the conclusion of the bankruptcy court that subtracting disposition costs from the fair market value in arriving at a valuation for the Bank's interest in the Property is consistent with the language of section 506(a) and is not inconsistent with the concerns underlying the decisions in *Rash, Trimble,* and *Winthrop, supra.*

## XIV. *The "Best Interests" Test*

 The Bank contends that the Plan does not satisfy the "best interests" test of section 1129(a)(7) with respect to dissenting class 4 claims. Section 1129(a)(7) provides that if the holder of a claim impaired under a plan of reorganization has not accepted the plan, then such holder must "receive . . . on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . . if the debtor were liquidated

under chapter 7 ... on such date." The Bank does not contest that its deficiency claim meets this test, because it would receive nothing on account of that claim in a chapter 7 liquidation. The Bank also has trade claims in class 4, however, which are to be paid in full under the Plan *without* interest. The Bank contends that under a chapter 7 liquidation, these claims would be paid in full *with* interest from several sources, including cash on hand and/or from the resources of the Debtor's general partners pursuant to section 723.

The order of distribution of a debtor's property under a chapter 7 liquidation is governed by section 726, which distinguishes the "payment of claims" (section 726(a)(1)–(4)) from the "payment of interest ... on any claim paid under paragraph (1), (2), (3), or (4) of this subsection" (section 726(a)(5)). Section 726(a) provides that in the event of a deficiency of property of a partnership "to pay in full all claims which are allowed in a case under this chapter," the trustee shall have a claim against a "general partner to the extent that under applicable nonbankruptcy law such general partner is personally liable for such deficiency." The bankruptcy court found that the plain meaning of this provision affords the trustee a claim against a general partner only for payment of a claim, not interest on the claim. The Bank cites only *In re Gramercy Twins Associates,* 187 B.R. 112, 125 (Bankr.S.D.N.Y.1995) in support of its contention that the requirement of section 723(a) for the payment in full of all claims includes interest on those claims pursuant to 726(a)(5). The *Gramercy Twins* court summarizes at some length the assertions of the objecting creditor, including, among many others, the assertion that payment in full under section 723 includes interest. The court did not discuss that assertion however, because it concluded that the "best interests" test was not met in the plan before it on other, more substantial, grounds.

The Bank has not cited any decisions contrary to the bankruptcy court's interpretation of "claims" in section 723(a), nor has our research revealed any. Although we are not persuaded that the language of section 723(a) is as plain as the bankruptcy court thought,

we do agree that the clear distinction drawn by section 726(a) between "claims" and "interest" on claims makes it most likely that the reference to "claims" in section 723(a) does not include interest. We therefore conclude that the bankruptcy court correctly found that the Plan satisfies the "best interests" test.

We return to the Bank's concerns that it is not treated fairly. The gist of the Bank's position seems to be that it is an innocent party—the lender of funds that enabled the Debtor to invest in an office building, or more accurately, fifteen floors of an office building. The Debtor, or its partners, made a bad investment, because the Property lost value as a result of a downturn in the real estate market, and they stand to lose $20 million in taxes as a result. The Bank has also suffered a loss in the form of decreased value in the collateral for its nonrecourse loan. The Bank contends that it should be allowed to foreclose on the Property and take out whatever value is left in the building, while the Debtor's partners should be made to accept their tax loss—after all, they are the ones that made the bad investment. · To be made to continue a relationship with the Debtor, at a risk greater than it would like, and not have its money made available to it now, so that the Debtor's partners can avoid their tax loss, is simply unfair.

The Bank's argument is an appealing one. But the reality of the situation is not so simple. The Bank argues throughout that it is not even the Debtor that wants to avoid a tax loss, but its partners, as if that somehow makes the situation even more egregious. But that is no more than an artifact of the tax code—all tax consequences of a partnership fall on its partners. Furthermore, as we have discussed above, a desire to avoid adverse tax consequences is a perfectly valid reason to seek protection under the Bankruptcy Code. Yes, the Debtor's partners made a bad investment. But so did the Bank. Its lending of funds to purchase real estate is just as much an investment as the Debtor's purchase. Surely, the Bank thoroughly investigated the real estate market in general, as well as all relevant aspects of the Property, before making the loan. As it

turned out, the downturn in the market was unforeseen. Whether it should have been foreseen we will not speculate. The fact is, neither party—both sophisticated players in their fields—did foresee it. The loss in value of the Property was not due to poor management or unsound business practices. All indications are that the Property itself is a prime piece of real estate and has been managed in an exemplary fashion. The loss was due to factors entirely beyond the control of either Debtor or Bank. Now the Bank wishes to cash out and let the Debtor (or its partners) sink.

The chief obstacle for the Bank is the Bankruptcy Code. Unless it can defeat the decision by the bankruptcy court to confirm the Debtor's Plan, it will not be able to cash out—at least not yet. The better view is to realize that chapter 11 reorganization is a collective remedy, designed to find the optimum solution for all parties connected with a business—not solely the for business itself, and not solely for its creditors. Without the Debtor's Plan, the Debtor's partners will surely take a bath. With the Plan, the prospects of the Bank's taking a bath are remote, perhaps a little greater than otherwise, but not much, and in fact, the Bank—though it asserts it does not want the Plan—stands to gain more than it would through a foreclosure now. What would the Bank do with the proceeds of an immediate foreclosure? Undoubtedly, it would lend the money in the form of mortgages not very different from the loan it now has—and is forced to continue to have—with the Debtor. Its income would be roughly the same. So it has not lost much, if anything. The Bank counters that it is made to bear a greater risk than it would like. Perhaps. But, the Debtor has chosen to seek protection against a much more certain loss—as it is entitled to under the Bankruptcy Code—and the bankruptcy court has determined, after a thorough examination of the relationship and the factors that impinge on its future, that the Bank's risk, under the confirmed Plan, is little different from what it would be in a more normal lending relationship. So much is true if the Plan is a workable one. That brings us to the second part of our summary.

In order for a plan to be confirmed, it must meet all of a rather large number of conditions that are set forth in section 1129. These conditions are designed not only to insure that a plan will work, but that it meets minimum standards of fairness for all participants. The Bank has challenged the bankruptcy court's order confirming the Plan on the basis of most of these conditions, and most of the Bank's objections are credible. That is perhaps not surprising. Any debtor in bankruptcy will have limited resources and will accordingly find it difficult to meet all of the conditions of section 1129. If a debtor could easily meet all of them, it probably has sufficient resources that it need not have filed a petition under chapter 11. Nevertheless, plans of reorganization are often confirmed. As is clear from our examination above of the many decisions challenged by the Bank, bankruptcy courts are given a great deal of discretion in determining whether or not to confirm a plan. All that is required is that the conditions of section 1129 are reasonably met and that the plan has a reasonable likelihood of success. Our review of this Plan leaves us with the clear overall impression that, even though one may reasonably quibble with the bankruptcy court's conclusions here and there, the Plan has a high likelihood of success and is fair to all participants, even though it may not be to the Bank's liking. It is also apparent from the wealth of case law that has been asserted in this appeal that those plans that are not confirmed, or whose confirmation is reversed on appeal, are overwhelmingly plans that very obviously will not work. That is not true of this Plan. Therefore, we affirm the bankruptcy court.

### Appeal of Denial of Relief from Stay and Conversion

The Bank also appeals from the bankruptcy court's denial of its motion for relief from the automatic stay pursuant to section 362(d) and its motion to convert the Debtor's chapter 11 case to a case under chapter 7, or in the alternative, to dismiss the chapter 11 case pursuant to section 1112(b). Its only argument is that reversal of the Confirmation Order requires reversal of the denials of the two motions. Because we affirm the

Confirmation Order, we also affirm the bankruptcy court's denial of the Bank's motion for relief from stay and of its motion for conversion or dismissal.

### Conclusion

For the reasons set forth above, the Debtor's motion to dismiss the Bank's appeal as moot is denied; the bankruptcy court's order confirming the Debtor's second Amended Plan of Reorganization Dated September 11, 1995 as modified is affirmed; and the bankruptcy court's orders denying the Bank's motion for relief from the automatic stay and denying the Bank's motion for conversion are affirmed.

### JUDGMENT

IT IS ORDERED AND ADJUDGED the Debtor's motion to dismiss the Bank's appeal as moot is denied; the bankruptcy court's order confirming the Debtor's second Amended Plan of Reorganization Dated September 11, 1995 as modified is affirmed; and the bankruptcy court's orders denying the Bank's motion for relief from the automatic stay and denying the Bank's motion for conversion are affirmed.